No. 22.—THOMAS B. GORMAN, plaintiff in error *vs.* CHARLES CAMPBELL, defendant.

[1.] A charge is objectionable which states general principles correctly, but which are nevertheless not applicable to the facts as proven. The instructions should always be given, in reference to the evidence in the particular case.

[2.] To neglect to exercise authority to forbid a thing, is in legal contemplation to permit it.

[3.] Hiring a slave is a contract of bailment, and the hirer is bound to exercise ordinary diligence in supervising the slave.

[4.] If necessary in the protection of the slave, the hirer may not only use coercion, even to chains, to restrain the slave from risk and exposure; but it is his duty so to do, and he will make himself personally responsible by neglecting his obligation in this respect.

[5.] Humanity to the slave, as well as a due regard for the interest of the owner, demand, alike, that the rules of law regulating the contract of hiring should not be relaxed.

[6.] The hirer of a slave is not liable for the loss of his life, in the service for which he was employed, unless guilty of wilful misconduct or culpable negligence.

[7.] Where a slave is put to a different purpose from what was intended, the hirer is responsible for his loss of life, although by inevitable casualty, and although the loss arose from the voluntary act of the slave.

Case in Bibb Superior Court. Tried before Judge POWERS, May Term, 1853.

This was an action to recover the value of a negro man named London, whom the plaintiff Gorman had hired to Campbell, the defendant, as a steamboat hand, on the Ocmulgee and Altamaha rivers, and who had been drowned while so hired.

The testimony exhibited the following state of facts: The negro was employed on board the steamboat Sam Jones. It is not customary, on the river, to employ negroes in the labor of clearing out obstructions, or cutting new passages in the river, unless under circumstances of urgent necessity. On this occasion, the Captain and the white hands were employed in cutting away logs in the rivers, to clear a passage for the boat, when this negro engaged in the work of his own accord, and worked for about half an hour, in the presence and sight of the Captain, without any thing being said to him. At length, when the log on which he was cutting was about to give way, the Captain called to him to quit and get off the log. The negro then jumped on another log, which proved to be loose, and floated down the stream with him on it. Soon his hat fell off, in endeavoring to recover which, he fell into the water and was drowned.

Thomas B. Gorman *vs.* Charles Campbell.

The charge of the Court to the jury was, that in the case of a bale or box of goods, it would be the Captain's duty to place in safety; but it was different with the kind of property in dispute; that *it* was a sentient being, capable of volition and locomotion; and if they believed the boy London was engaged in the work by the express command or permission of the Captain, the defendant was liable: but if they believed the negro engaged in the work of his own free will, and the Captain forbid him to do it, the defendant was not liable, because the owner of the boat and its officers, are not required to keep the negro in chains, which he must do if he were responsible for any act of his, however trivial, while on the boat, if it should end disastrously.

Under this charge, the jury found for defendant, and the plaintiff excepted to the same.

Poe, Nisbet & Poe, for plaintiff in error.

Whittle, for defendant.

*By the Court.*—Lumpkin, J. delivering opinion.

James B. Gorman, the plaintiff in error, as well as in the action in the Court below, about the first of January, 1852, hired his boy London to Charles Campbell, the defendant, at the rate of fifteen dollars per month, to go upon the Ocmulgee and Altamaha rivers, as a boat-hand.

Richard Bishop testifies, that on the nineteenth day of May, 1852, the steamer Sam Jones having been tied up for several days, not being able to ascend the Altamaha, the Captain and white hands were engaged in clearing a new passage for her. The negroes were not employed in the water, it not being the custom for negroes hired as boat-hands to engage in removing obstructions from the river. That the boy London, of his own accord, in presence of the Captain, went into the river and commenced cutting a log. That he was about half an hour in cutting the log in two, *and the Captain was present during that time.* That the water was very swift at the place he was

Thomas B. Gorman *vs.* Charles Campbell.

working; and when he had cut the log, to save himself from being carried down stream, he jumped upon another log which projected into the river, but which gave way and floated off, with the boy on it. That his hat fell off, and in endeavoring to recover it he sunk very suddenly, and was found drowned some short distance below, in water four or five feet deep. That when the Captain saw that the log which London was cutting was about to be carried down stream, he called to him several times to desist. That the log soon gave way; London attempted to save himself, and was carried down by the current, and drowned. This witness thinks the negro worth five hundred dollars. The case having been closed on the part of the plaintiff, the depositions of Barry Dillard and William Rindtree, the Captain and Chief Engineer of the boat, were read. They proved the loss of the boy at Briggs' Cut on the Altamaha river, and at the time stated by Bishop. The witnesses swear that they were engaged at the time, in cutting and cleaning out logs which obstructed the passage of the boat. One had been cut and started down, when the boy London got on it; so soon as he did so, he was ordered by them to leave the log, but remained on it. This order was repeated as many as three times, but he remained, and continued floating down, when one of the witnesses (Rondtree) started after him. The boy fell, or got off, and was drowned in water three or four feet deep. When he was picked up, he was some distance above the log. They testify, that the boy was not drowned from the improper management of the owners of the boat. Express orders were given by the witnesses for no negro to engage in the work of clearing the river. And after the boy, contrary to orders, had got upon the log, he was ordered off; and had he remained on the bank, as he was told to do, he would not have lost his life, at least from the accident in the river. The boy was hired to do the usual work of a hand on the boat, and was taken care of and put to nothing else. He was never exposed to danger or risk. When London was taken from the river, his tongue was blistered and badly bitten, from which circumstance, and the shallowness of the river, witnesses were induced to think at the

time, and yet believe, that London had a fit, which caused him to drown. The water was almost an eddy. The negro is said to have been an expert swimmer.

[1.] The evidence being closed on both sides, the Court charged the jury:

" That in case of a bale or box of goods or other inanimate object, it would have been the Captain's duty to have placed it in a situation of safety; and the boat is responsible if not so kept, without the liberty of excuse on the part of the boat.— But that it was different with the kind of property in dispute. That *it* was a sentient being, capable of volition and locomotion; and if they believed the boy London engaged in the work by the express command or even permission of the Captain, the defendant was liable. But if they believed that the negro engaged in the work of his own free will, and the Captain forbid him to do it, the defendant was not liable. That it was not necessary to use coercion with this kind of property. Because the owner of the boat and its officers were not required to keep the negro in chains, which they must do if they were to be made responsible for any act of his, while on the boat, which might end disastrously".

The jury found a verdict for the defendant.

Did the Court charge the jury correctly as to the law of this case?

There is no conflict between the testimony of Bishop and that of Dillard and Rondtree. The two last take up the transaction precisely where the first leaves it. They swear exclusively as to what transpired after London got on the log which was drifting down the river. But unintentionally, of course, they wholly abstain from referring to the previous half hour's cutting in the presence of Captain Dillard, proven by Bishop—and that is the hinge upon which this case turns. Is it possible for London to have been at work for one half hour in the presence of these gentlemen before he attempted to escape, and they not know it? To their credit they do not so testify. Indeed, he was commanded to desist just as the log he was cutting, was about to fall, and precipitate him into the river, which as it

turned out, was unfortunately, just a few moments too late to save London's life. It was an accidental omission, no doubt, that the witnesses for the defendant failed to state how London came to be on the floating log! Did he jump on it, from the shore? Their testimony is significantly silent upon this material point! Bishop is unimpeached, and uncontradicted.

But to the charge of the Court. It is defective, as many charges are, in laying down correctly a general principle without applying it to the facts of the case before the jury, and which is not true, as restricted to these facts. Our brother ruled rightly in instructing the jury that if the boy acted by the command or even permission of the Captain and officers of the boat, that the owners were liable for his loss.

[2.] But he failed to state to the jury, as he should have done, that if they believed the testimony of Bishop, that London was engaged for one-half hour in the presence of the Captain, in cutting a log, before he interfered to stop him, and that he only interposed when he saw the peril impending, by the giving way of the sundered log, that then his permission should be implied. For to neglect to exercise authority to forbid a thing, is to permit it.

But this error is one of omission. His Honor next charged the jury that if the boy engaged in this hazardous employment of his own accord, and the Captain commanded him to desist, that the defendant is not liable. And that coercion was not necessary to be used with this species of property: otherwise, resort must be had to chains.

Now the first clause of these instructions is a generality: but it is not the law of this case, as made out by the proof. This negro did engage in this work of his own accord; and the Captain did order him to desist; and yet the defendant should be made liable, because the Captain did not arrest the work *immediately*, and before it was too late. What signifies it that he hallooed to him to get away when the timber was sliding from beneath his feet, after standing by for a half hour previously, and seeing him cutting the log? Nothing is more dangerous than to lay down general propositions, which, instead of aiding,

scarcely ever fail to mislead juries. Courts should apply the principles of law to the facts in evidence in each particular case ; stating those facts hypothetically.

[3.] Hiring is a contract of bailment; and the hirer is bound to exercise ordinary diligence in taking care of the property. And not only is the hirer liable, if the slave be put to a different service from that for which he was employed, whereby injury accrues to the owner.

[4.] But even in following the calling for which he was engaged, it is still the duty of the hirer to exercise proper care in the supervision of the slave. And he not only *may* use coercion even to chains, if necessary, for the protection of the property from peril, but it is his duty to do so. And he will make himself responsible, if neglecting his obligations in this respect the property is destroyed, or its value impaired. This portion of the charge, therefore, was fundamentally erroneous.

[5.] And humanity to the slave, as well as a proper regard for the interest of the owner, alike demand that the rules of law, regulating this contract, should not be relaxed. We must enforce the obligations which this contract imposes, by making it the interest of all who employ slaves, to watch over their lives and safety. Their improvidence demands it. They are incapable of self-preservation, either in danger or in disease.—— This office devolves upon those who are entrusted, for the time being, with their custody and control. And if they fail faithfully to perform it, it becomes a high and solemn duty of all Courts to enforce the trust by the only means in their power—— a direct appeal to the pocket of the delinquent party.

In *Strawbridge vs. Turner et al.* (9 *Louisiana Rep.* 213) the owners of a steamboat suffered a slave to be employed as a hand on board, by the Captain, without the authority and consent of his owner, and he was accidentally drowned. The Court held that the owners of the boat were responsible and liable to pay his value, *because, by using due diligence, they might have prevented the illegal employment of the slave.*

In *Butler vs. N. G. W. & R. W. Walker,* (*Rice's Rep.* 182)

the Court of Appeals held, that the hirer was not only bound by his contract, not to place the slave in danger by his command, *but to prevent him from being in danger.*

In *Duncan vs. The South Carolina Rail Road Company*, (2 *Rich. Rep.* 613) the slave of the plaintiff was hired to work on the defendant's road, and it was agreed that he should not be employed on the cars or locomotives, but that he might be carried on the same "From any one place to another place, on the rail road, where his services may be required." The slave, *with the knowledge of the Conductor*, went on the cars, and was carried beyond the place at which his services were that day required; and in jumping from the cars, while they were in motion, was killed. The Court held that the company was liable to the owner for the loss.

And in delivering its opinion, the Court say, " In such a case it is in vain to say that the slave is a moral agent—capable of wrong as well as of right action; and that he killed himself by jumping off when he ought not".

[6.] Had London been killed while employed as one of the boat-hands, for which service he was hired, the defendant would not have been liable unless the loss had been occasioned by his wilful misconduct or culpable neglect.

[7.] But having engaged, in the presence of the Captain of the boat, in a different and more dangerous business from that which was stipulated and intended by the parties, the hirer is responsible for the loss of life which occurred, although, by inevitable casualty. And it is no protection that the loss arose from the voluntary act of the slave.

The judgment of the Circuit Court must be reversed, and the cause remanded for a new trial.