IN THE

# Supreme Court of Georgia,

## AT ATLANTA.

### FEBRUARY TERM, 1884.

PRESENT—JAMES JACKSON, . . . . . . . CHIEF JUSTICE
SAMUEL HALL, . . . . . . . . ASSOCIATE "
M. H. BLANDFORD, . . . . . " "

## THE AUGUSTA FACTORY vs. BARNES.

1. An action by a father for the loss of services resulting from injury to his minor child, caused by the negligence of the agent at a factory where she was employed, is not a case for vindictive or exemplary damages, and a charge to that effect was error; but the amount found by the verdict did not exceed the actual loss proved, and the error in the charge, having done no injury, will not require a new trial.

2. The test to determine whether a plea amounts to a justification, so as to give the defendant the right to open and conclude, is whether such plea sets up facts which could not have gone in evidence under the general issue.

(a.) To an action by the father of a factory operative for an injury to his minor daughter, resulting from the negligence of the defendant's agents, a plea admitting that, on a day named, the daughter was employed by the company in its spinning room, and while so employed was injured, but denying that she was in the discharge and performance of her lawful duty, or that the company employed or continued to employ incompetent agents or officers, or that their acts were negligent, and asserting that, at the time of the injury, the girl was acting in violation of her instructions and outside of the scope of her employment, and that the injury resulted from her own negligence, was not a plea of justification.

3. There was no error in refusing a non-suit in this case. Whenever a *prima facie* case is made out, questions of fact should be left to the jury.

4. In an action by a father against a factory company for injury to his minor daughter, the defendant having pleaded and proved that the daughter received her semi-weekly wages from it; that they were always paid to her and never to the father, and that the rent of the house which his family occupied was paid from this source; and it being argued from this that she had been emancipated from his control, and that he had relinquished all right to her earnings, it was admissible to show, in rebuttal of this, that she regularly accounted for and paid to him her wages.

5. A young girl received a terrible and painful injury while employed in a factory, and subsequently died from it; about half an hour after the injury, upon the return of her father to his home on receiving information of the accident, she stated to him that they put her to work on some new frames; that she refused to go, and the second hand cursed her and told her to go to work; that this frame was different from the old frame, and she did not want to run it; that they had to "duff" and stop the machinery to clean it off, and that the agent who directed the work at this frame started it without giving the usual signal. It was shown that she was injured while cleaning machinery, and that the person named as starting the machinery directed the work of the operatives at that particular frame and gave the signal prior to starting:

*Held,* that the statement was admissible as a part of the *res gestæ.*

(a.) Where the competency of evidence is doubtful, it should go to the jury, that they may consider how far its force is impaired by surrounding incidents.

(b.) The death of the person making the statements which form a part of the *res gestæ* is no ground for their exclusion from evidence. Section 3854 of the Code does not apply to such a case.

6. What one physician stated to another as to the cause of the disease of which the girl died was hearsay and inadmissible; nor did it appear that the physician was inaccessible or incompetent as a witness.

7. In case of the injury of an adult by the negligence of a co-employé, where the injured servant used all ordinary care and diligence to avoid the injury from the principal's other servants with whom he was disconnected at the time, and where he was acting in obedience to the orders of another servant over him, whose orders he was bound to obey, this court has held that he had a right to recover for the injury inflicted. Where the injured employé is a child of tender years, the master is bound to a higher degree of care.

(a.) Although an infant employé in a factory may not have been in

the line of her duty at the time of an injury to her, yet if she was set to work on a particular frame, and what she did in cleaning the machinery was done under the direction of the superintendent of that work, and he did not forbid her engaging therein, he was bound to ordinary diligence in supervising her conduct, and if necessary to her protection, he not only might use coercion to restrain her from exposure and risk, but it was his duty to do so, and for neglecting his obligation in this respect his principal would be responsible.

(b.) The act of 1853 (Code, §§1885, 1886) does not lessen the obligation of the employer to look to the safety and protection of the minor operative, or interfere with the right of the parent to the earnings of his minor child, but affords another safeguard against the personal abuse of the minor by limiting the authority over him so far as it expresses, but no farther.

April 8, 1884.

Master and Servant. Parent and Child. Damages. Negligence. Principal and Agent. Non-suit. *Res gestæ.* Pleadings. Evidence. Before Judge RONEY. Richmond Superior Court. October Term, 1883.

C. G. Barnes brought suit against the Augusta Factory to recover damages for an injury to his minor daughter, which it was alleged resulted in her death.

The evidence for the plaintiff was, in brief, as follows:

Anna E. Barnes, the daughter of plaintiff, was fourteen years of age. She was employed by defendant. Cason was the second hand in the spinning room. This room was divided into sections, and Carter was in charge of one section. (At another part of the plaintiff's testimony, Carter is also called the second hand.) It was a part of his duty to give the signal for the frames to start. This is generally done by striking together two caps which are on the frame, or by striking the frame with a bobbin. There were three new frames in the room, which were in charge of two girls of the name of Sheehan. Anna Barnes was put at one of these frames to help in connection with it. When the machine was stopped for the purpose of taking off full bobbins and putting on empty ones (called "duffing"), she was engaged in cleaning some of the machinery. It was the duty of

Carter to give the usual signal before starting the machinery, but he failed to do so, and the hand of Anna Barnes was caught in the gearing, and badly torn and lacerated, so as to render the amputation of one finger necessary. She did very well for a few days, and was able to go to the factory, which was close by, and to the place near by where her father was at work. She soon, however, had symptoms of convulsions and of lock-jaw (*tetanus*), and died several weeks, after the injury from the effects of it. She only had measles a few days before her death. They had broken out and recovered before that time. The death resulted from lock-jaw, as just stated. Exposure with measles might complicate the case. She was carried home at once after the injury, and her father was sent for. On his arrival shortly afterwards, and while she was suffering from the wound, she made a statement as to how it occurred. (One or two of the witnesses speak of this statement as having been made "immediately after she was hurt." The father, who first detailed it, stated that he was sent for, and upon his arrival the statement was made to him. It was between eight and nine o'clock A. M. Another witness testified that the accident occurred about eight o'clock A. M.) This statement and the attendant circumstances were thus detailed by the father as a witness: "My daughter left my house about six o'clock in the morning, and I saw her again between eight and nine o'clock the same day. When I saw her, one of the fingers of her right hand was all cut up, and the other finger ripped up and a bruise on the top of the hand; a piece of the cog-wheel was in her hand, and she made this statement to me as soon as I saw her. She said at that time that they put her on some new frames, and that she refused to go on, and Mr. Cason, the second hand, cursed after her and told her to go to work; that this frame was different from the old frames, and she did not want to run it, but after he cursed her she went on anyhow; that they had to 'duff' and stopped the machinery, and she was cleaning off; and that Mr. Carter

started it off without giving the signal." She also stated that it was a part of her duty to clean off the gearing while the "duffing" was being done. The cause of the injury was the failure of Carter to give the signal. It was his duty to go around and overlook the frames and see that work was done. At the time of the accident, Anna Barnes did not have any frame to take care of; she was helping another girl to clean her frame. Her father had never relinquished his parental right to receive her wages. She received the pay tickets from the factory and drew the money, but paid it to him.

There was other evidence as to the value of services. etc.

The court refused a non-suit, on motion therefor.

Plaintiff further introduced testimony that, after the injury and shortly before the girl's death, she sent for Carter and had a conversation with him, in which he admitted that he started the frame without giving the signal, but said he did not think anybody was in the frame; that he did not see her, or he would not have done it for the world. She told him she forgave him. The injury was on March 31, and she died on April 26.

The evidence for the defendant was, in brief, as follows: Cason, the second hand in the spinning room, told Anna Barnes to cut and mend the threads; she was told to allow the other girls who were running the frames to clean them off, and they also were so instructed. She had no frame of her own, but was merely a helper, and her duty ceased when the frame stopped. There was more gearing on the new frames than on the old ones, but they were not more dangerous. Cason denied that she objected to going to work on the new frame, or that he cursed or used any bad language to her, or put her in a dangerous position, and stated that when she was hurt she was not in the discharge of the duty required of her. Carter was section hand and acting second hand. He had been in the factory for fourteen years and was a careful man. He had never been

known by the witnesses to start a frame without giving the signal. Before the accident occurred, he looked on both sides of the frame and saw the girl who was in charge of it at her place; he gave the usual signal for starting, and after a few seconds the machine was started. A loud cry was heard; he at once stopped the frame, and found Anna Barnes underneath, with her hand caught in the gearing. It was the duty of a girl in charge of a frame to clean it. If she were sick and another were put there, it would be her duty to clean it. Anna Barnes was paid by tickets issued in her own name, to be returned for settlement at the next pay day, with a deduction for the rent of the house occupied by the family. These were paid only on presentation, and she collected them herself. About eight days after the accident, she was in the factory grounds on a cold, drizzly day. She had a case of suppressed measles, which did not break out till her death. She was just reaching the age of puberty, and contracted a severe cold. Several members of the family had measles at the time of the accident. When she sent for Carter, he did not admit that he started the machinery without giving the signal, nor did she say that she forgave him, but that she did not blame him.

The jury found for the plaintiff $1,000.00. Defendant moved for a new trial, which was refused, and defendant excepted.

The grounds of error are sufficiently stated in the divisions of the decision where they are discussed; and it is only necessary to state, in connection with the sixth division, that the fourth ground of the motion was as follows:

"Because the court, when Dr. Dessaussure Ford was a witness for plaintiff, and defendant proposed, on cross-examination, to show that, at the time of his examination of the deceased child, which disclosed that she had *tetanus*, from which, in the opinion of witness, she never would recover, and which, under his then opinion, would prove fatal, he was not allowed to state the information given

to him at the time coming from Dr. Wright, the physician attending the girl; that after her injury, she had been caught in the rain. The error alleged is that, being an expert and his opinion given as to the cause of death, the defendant was prevented from showing all the facts or statements upon which it was based or controverting the correctness of the opinion."

FRANK H. MILLER, for plaintiff in error.

H. D. D. TWIGGS; SALEM DUTCHER, for defendant.

HALL, Justice.

This action was brought by the plaintiff to recover compensation for loss of the services of his minor daughter, who was so seriously injured while in the employment of defendant, by the carelessness, inattention and negligence of its agent, as to occasion her death. The trial resulted in a verdict of $1,000 for the plaintiff, and a motion for a new trial was made on various grounds, and refused. The judgment refusing this new trial is here upon bill of exceptions and writ of error for review.

1. The judge instructed the jury that this was a case in which they might give exemplary or punitive damages, as a recompense for the wounded feelings of the plaintiff, and were we not well satisfied that in this finding they had allowed nothing on this account, this error in the law as charged would compel the grant of a new trial, for this is not an action in which vindictive or general damages can be given. Such only as are proved to have been sustained, such as are capable of exact computation, can be recovered. On the hearing in this court, this was conceded by the counsel for plaintiff. The amount found does not exceed the actual value of the loss proved, and as the error in the charge did not affect the verdict, it is not good ground for a new trial. 41 *Ga.*, 675, 680. In the *Central Railroad vs. DeBray*, 71 *Ga.*, 406, we held that, " as no

special damages were found by the jury, and as the ver-dict was such as to warrant the conclusion, that no such damages entered into the same, the defendant was not hurt by a charge on that subject."

2. Among others the defendant filed the following plea:

"It admits that on the 30th day of March, 1881, Anna Elizabeth Barnes (the plaintiff's minor daughter) was employed by it in its spinning room, and while so employed was injured, but it avers that, at the time of such injury, she was not in the discharge and perform-ance of her lawful duty and due service, but in the violation of the instructions received from immediate superiors, and engaged in do-ing an act positively prohibited on her part, which act increased her risk and caused her injury.

"That this defendant, denying that it has ever employed an in-competent servant, or continued one in charge with knowledge of his incompetency, or that the officers in charge of the spinning room at the time of the injury of Anna Elizabeth Barnes, were then, or ever had been, incompetent or neglectful of their duties to her, hereby pleads that the actions of the servants, had upon the day and at the time of the injury of the said Anna Elizabeth Barnes, save and ex-cept the individual act of the said Anna Elizabeth Barnes, which was outside of the scope of her employment and her duties, were justifia-ble, right and proper."

This was claimed to be in confession and avoidance, and it was insisted amounted to a special plea of justification, which entitled the defendant to open and conclude the argument to the jury; the judge was of a different opin-ion, and refused this privilege to the defendant. Our opinion is that he ruled correctly, and that the point is covered by the case of the *Ocean Steamship Co. vs. Wil-liams*, 69 *Ga.*, 251. There is no fact set up in this plea that might not have gone in evidence under the general issue, and according to that case, this is a decisive test as to the character of the defence.

3. At the close of plaintiff's testimony, a motion was made to non-suit the case, which was refused. This rul-ing was clearly right, as will more fully appear when the questions upon which the recovery depends are to be con-sidered. In *Cook vs. The Western & Atlantic Railroad Co.*, 69 *Ga.*, 619, we laid down this rule upon the subject of

non suits, viz.: that when there was not sufficient evidence to support a finding for the plaintiff, and when all the facts proved and all reasonable deductions therefrom would not support such a verdict, then the case should not be sent to the jury. But on the other hand, the court cannot be compelled to take the place of the jury and pass upon the facts, by granting a non-suit, because he would not be satisfied with a verdict in favor of the plaintiff. He may always remit questions of fact to them, and should not fail to do so whenever a *prima facie* case is made out.

4. The defendant pleaded and proved that the plaintiff's daughter received her semi-weekly wages from it; that they were paid to her always and never to him; that the rent of the house which his family occupied was paid from this source, and from this it was argued that she had been emancipated from his control, and that he had relinquished all right to her earnings. In reply to this defence, he offered evidence to show that she regularly accounted for and paid to him her wages. Conceding that the facts pleaded and proved would, if uncontradicted, justify the conclusion sought to be drawn from them, yet that conclusion could be rebutted by the evidence offered by the plaintiff in reply, which, as we conceive, was pertinent to that issue, and the court did not err in overruling defendant's objection to the same.

5. Testimony was offered and admitted, to the effect that a statement was made by plaintiff's daughter to him, on his return to his home, upon receiving information of her injury, where she had been carried from the factory directly after she had been wounded. It was shown that about a half hour had elapsed between the injury and the statement, and that no officer of the company was present when it was made. She said that they put her on some new frames; that she refused to go on, and Mr. Cason, the second hand, cursed her and told her to go to work; that this frame was different from the old frames, and she did not want to run it; but after he cursed her, she went on

any how; that they had to "duff" and they stopped the machinery to clean it off, and that Mr. Carter had started it off without giving the signal.

The injury was shown to have been inflicted while she was engaged in cleaning the machinery, and that Carter directed the work of the operatives at this particular frame, and was the person who gave the signal prior to starting it. This statement was objected to because it was not a part of the *res gestœ*, nor could it be considered in the light of dying declarations, but was merely the hearsay testimony of one then dead. It was not offered as dying declarations, but as a part of the *res gestœ*, and if admissible, it is conceded that it was only on that ground; that the statement was made at a different place from that at which the injury occurred, and after the lapse of some short time, if there were nothing else connected with it, would hardly afford a plausible ground for its rejection · but considering the circumstances, the terrible suffering the child was then and had been enduring from the frightful injury that had so recently occurred, we think a case was presented where a judge should have paused long before rejecting it; the propriety of the rejection would have been, to say the least, doubtful, and in cases where the competency of evidence is doubtful, it should go to the jury, that they may consider how far its force is impaired by these incidents.

The common law, as well as the Code, §3773, makes declarations accompanying an act, or so nearly connected therewith, in time, as to be free from all suspicion of device or afterthought, admissible in evidence as part of the *res gestœ*. It is scarcely credible that this little girl, while enduring such excruciating pain, perhaps torture would not be too strong a word to characterize it, from this frightful wound, would have been capable of framing a story with a view to her ultimate advantage of gain, or for any other ulterior purpose. Her mind must at that time have been wholly occupied with her own condition; this, it seems to

us, would be the reasonable and natural conclusion of any mind not warped by prejudice or biased by some strong motive leading or driving it in the opposite direction. Both the text-writers and the reports furnish numerous instances fully sustaining the ruling in this case. Among many others see 15 *Ga.*, 635; 11 *Id.*, 615; 47 *Id.*, 24, 41, 42, 68; 61 *Id.*, 192; 65 *Id.*, 94; 67 *Id.*, 636; *Mullery vs. Hamilton*, 71 *Ga.*, 720. There is a very full and satisfactory discussion of the subject in 8 Wall, 397; 1 Greenleaf's Ev., §108, and following sections of that learned and valuable work.

It was suggested, rather than seriously urged, in the argument here, that the party making these declarations being dead, the same should be excluded, under the exceptions contained in the evidence act, Code, §3854, but we cannot bring our minds to the conclusion that there is anything in this point. The declarant, in this instance, can scarcely be deemed in a legal, nor, indeed, in any other sense, a party to the cause of action on trial, and this suit is certainly not prosecuted at the instance of an executor or administrator, or of one acting in any fiduciary right. It is the personal and individual suit of the plaintiff to recover for the loss of services due to him only, and for which he is not accountable to any other.

6. We do not think there was error in rejecting as testimony what another physician told Dr. Ford, as to the cause which produced the *tetanus* of which the girl died. This was certainly hearsay testimony, and it is not made to appear that the physician, who attended the deceased and imparted this information, was not accessible, and was not a competent witness.

7. In case of the injury of an adult by the negligence of a co-employé, we have frequently passed upon the liability of the principal for damages, and fixed the limitations and conditions upon which a recovery might be had. In *The Central R. R. & Banking Co. vs. DeBray*, 71 *Ga.*, 406, we carefully examined our previous decisions, together

with the authorities in the text-writers, and the cases from the English courts and the courts of this country, and came to the conclusion that, where the plaintiff used all ordinary care and diligence to avoid the injury occasioned by the negligence of the principal's other servants, with whom he was disconnected at the time, and where he was acting in obedience to the orders of another servant over him, and whose orders he was bound to obey, that he had a right to recover for the injury inflicted under such circumstances.

This was substantially the instruction given by the court to the jury in the present case, and we think there was nothing in it to which the defendant could object; but are of opinion that, had the court gone farther, and held the defendant's agent in the case of this minor to a higher degree of care, there would have been nothing objectionable in his charge. The defendant owed a duty to this child, which required its agents in authority over her to look after her safety, while under its charge and engaged in the performance of her duties. Such was the ruling of this court, in the *Atlanta Cotton Factory Co. vs. Speer*, 69 *Ga.*, 137, and we do not understand that there was anything in the opinion of Mr. Justice Crawford, who dissented from the majority, contravening this rule; so that to this extent the judgment may be considered unanimous. Even if this were not the case, the principle is firmly settled by the previous adjudications of this court, in which the party injured sustained to the employer a subordinate relation, like that of an infant employé. In *Scudder vs. Woodbridge*, 1 *Kelly*, 195, it was distinctly ruled that the doctrine that the principal is not liable to one agent or employé for damages occasioned by the negligence or misconduct of another agent or employé, is not applicable to slaves. The reasons given in that case for this exception, as set forth by Lumpkin, J., p. 199 of the opinion, strike us as entirely satisfactory. He says: "There is one view alone which would be conclusive with the court.

The restriction of this rule is indispensable to the welfare of the slave. In almost every occupation requiring combined effort, the employer necessarily entrusts it to a variety of agents. Many of these are destitute of principle and bankrupt in fortune. Once let it be promulgated that the owner of negroes hired to the numerous navigation, railroad, mining and manufacturing companies, which dot the whole country and are rapidly increasing; I repeat, that for any injury done to this species of property, let it be understood and settled that the employer is not liable, but that the owner must look for compensation to the co-servant who occasioned the mischief, and I hesitate not to affirm that the life of no hired slave would be safe. As it is, the guards thrown around this class of our population are sufficiently few and feeble. We are altogether disinclined to lessen their number or weaken their force. We are, therefore, cordially, confidently and unanimously agreed, and so adjudge," etc.

It is insisted, in this case, that the infant employé was not in the line of her duty, or in the performance of the work assigned her, when this injury befell her. Be this as it may, it is certain that she was set to work on that particular frame, and that what she did in cleaning the machinery was done under the eye of the superintendent of that work, and he did not forbid her engaging therein. This court has held that, as the agent of the company hiring her, he was bound to ordinary diligence in supervising her conduct, and if necessary to her protection, he might not only use coercion to restrain her from exposure and risk, but it was his duty to do so, and he would make his principal personally responsible by neglecting his obligation in this respect. 14 *Ga.*, 137. This rule was laid down in relation to a hired slave. But has the legislature been less careful of the rights of parents and less mindful of the safety of these little factory operatives than it was of those of masters and slaves, while slavery existed? We think it is liable to no such reproach. In 1853, an act was passed regulating

their labor in factories, prescribing the hours thereof, and declaring contracts in contravention of the act void, so far as relates to the enforcement thereof against such laborers. It was further enacted, that "no boss, or other superior in such establishments, shall inflict corporal punishment upon such minor laborers; and the owners of such factory or machine shop shall be directly liable for all such conduct on the part of their employés; and such minor may sue in his own name for damages for such conduct; and the recovery shall be his own property, and not belong to his parents." Code, §§1885, 1886.

This statute does not, as we apprehend, lessen the obligation of the employer to look to the safety and protection of the minor operative, or interfere with the rights of the parents to the earnings of his minor child, as was insisted by the very able and learned counsel for the defendant. It gives an additional right to the child, and affords another safe-guard against his personal abuse, by limiting the authority over him so far as it expresses; but no farther.

This disposes of every question made by this record at all meterial to be considered; and the result of our investigation is, that there was no ruling or charge by the court below of which the defendant has the least right to complain.

Judgment affirmed.