19440, 19441.   SOUTHERN RAILWAY CO *v.* PEARCE, administratrix; and *vice versa.*

Decided July 10, 1929.   Rehearing denied July 31, 1929.

. *W. H. Trawick, C. C. Bunn, Maddox, Matthews & Owens,* for the railway company.

*Branch & Howard, F. A. Irwin,* contra.

Luke, J.   Mrs. Elizabeth Pearce, suing as administratrix of the estate of her husband, R. M. Pearce, for the benefit of herself and their four minor children, recovered a verdict and judgment against the Southern Railway Company for $24,000 for the alleged negligent killing of the said Pearce in a collision between two of the defendant's trains at about 6:35 o'clock in the night of December 23, 1926, at a point about three-quarters of a mile south of Rockmart, Ga.   The petition originally contained only one count, but another count was added by amendment.   During the trial of the case the plaintiff announced that she was not relying on count 1, and that count was withdrawn from the consideration of the jury.   The defendant excepted pendente lite to the overruling of its demurrers to the petition.   It excepted also to the overruling of its motion for a new trial, based upon the usual general grounds and numerous special grounds.   The plaintiff field a cross-bill of exceptions.

As we view the matter, none of the special grounds point out error that would warrant a reversal of the judgment, and the case hinges upon the validity of the general grounds of the motion for a motion for a new trial.

On December 23, 1926, the defendant was operating in a northerly direction, over its road leading from Atlanta, Ga., to Chattanooga, Tenn., a heavy, fast, tourist train, known as "Ponce de

Leon" and designated as "No. 2." On the same day, the defendant was operating on its said road a train similar to train No. 2, running from Chattanooga to Atlanta, and known as train "No. 101." R. M. Pearce was acting as the engineer on No. 2, the northbound train when the collision occurred, and the said train was engaged in interstate commerce. R. M. Pearce was employed by the defendant as road foreman of engines, and it was his "right and duty . . to travel over the division of defendant's road to which he was assigned, and to supervise the operation of engines by the engineers, and to himself operate engines when he deemed it proper or advisable to do so." Train No. 2 was scheduled to make no regular stops between Austell and Rome, and, "according to the rules, customs, and practice then of force," and known to defendant and its employees, "north-bound passenger-trains were to take the main track, and south-bound trains were to take the sidings at meeting points." On December 23, 1926, said Pearce, operating train No. 2, was approaching Rockmart from the south at about 6:30 or 6:40 at night. The south-bound train, No. 101, had already arrived at Rockmart, but had not taken the siding, and was moving very slowly along the main line south of Rockmart. Both trains were scheduled to arrive at Rockmart at 6:28 p. m. Extending in a southerly direction from Rockmart, and practically parallel with the main track, was a side-track nearly a mile long. A south-bound freight-train was standing on this siding. It was a dark, rainy night, and the track approaching Rockmart from the south was not straight, but had what is known as a double, or reverse, curve; and the said Pearce could not see that the main track was occupied by the south-bound train until his engine was within two or three hundred feet of the engine attached to the south-bound train, and until it was too late to avoid a collision. A collision did occur, and Pearce was "mashed, mangled, and received wounds and injuries" from which he died some twenty-four hours later. Pearce was forty-seven years of age, was earning $350 a month, provided for his wife and children $300 per month, and assisted in the care and training of his children.

It was alleged in the first count that "defendant was negligent in that said south-bound train was allowed to be upon and obstruct the said main line at said place at the time when the said Ponce de Leon, upon which her said husband, the said R. M. Pearce, was

acting as engineer as aforesaid, approached said place, the said Ponce de Leon train being a north-bound train as aforesaid." In short, count 1 of the petition was based upon the theory that the north-bound train had the right of way, and the defendant was negligent in having the south-bound train hold the main track when it should have taken the siding.

Count 2 alleges: that R. M. Pearce was furnished with "a certain time-table for the government of its employees in the operation of trains;" that, "according to said time-table, train No. 2 had the right, in the absence of any special orders to the contrary, to keep the main track;" that "a special order had been issued . . providing that train No. 101 should hold the main track, and that train No. 2 should take the siding at Rockmart;" that the effect of this special order was to supersede and reverse the rule requiring train No. 2 to hold the main track; that copies of said special order had been furnished to the engineer and conductor of train No. 101, and to the conductor in charge of train No. 2, but that none had been furnished to said Pearce, and he did not know that said special order had been issued; that defendant was negligent in that "said special order . . was not furnished to said R. M. Pearce," and he was allowed to operate his engine in ignorance of the same, "relying upon the time-table hereinbefore referred to." Other grounds of negligence are set out in count 2, but we see no occasion to state them. We conceive the controlling question to be whether or not the defendant was negligent in failing to furnish R. M. Pearce with the said special order, which precisely reversed his previous order requiring him to keep the main track. This makes necessary reference to some of the evidence.

S. J. Keith, engineer on the north-bound train, testified that he was the regular engineer on train No. 2; that he had the special order requiring his train to take the side-track and the south-bound train to hold the main line at Rockmart, and that he ran his engine from Atlanta to McPherson. We quote here from the testimony of this witness: "I had stopped at McPherson. . . I did not know Mr. Pearce was on the train. The first I saw of him he was sitting on the box-seat of 1219. . . I had been oiling the engine. I had stepped up in the gangway of the engine. He was on the box-seat. I said to him: "Bob, what are you going to do?" He said: "Mr. Keith, I am going to run to Rome

for you." He said: "What have you got?" I says: "Head in at Rockmart and meet No. 101." What is generally understood by railroad men by the term, "head in," is taking the siding. . . Well, when I said: "Head in at Rockmart and meet 101," he says: "And the usual slow orders?" I said, "Yes." He says: "Head in at Rockmart and meet No. 101; good." He repeated it back to me. I stepped right down off the engine and caught the baggage-car. . . He did not ask me for my written orders. I did not deliver them to him. . . I did not have time to do it before he started,—not unless he had stayed there a second and given me more time. I couldn't catch the train moving fast, and I got off just as soon as I could to catch the train. The train was a few minutes late. . . I had my orders in my overall-pocket. . . I could have handed them to him as quick as I handed them to you if he had said: 'Give me the orders.'"

Paul Copeland testified that he was baggage-master on train No. 101, and that after the collision he got out of his car and went to the engines of the two trains as soon as he could. Here the witness, referring to his conversation with R. M. Pearce, testified: "This happened just a few minutes after the wreck: I think it was over eight or ten minutes; I don't think it was over twenty minutes at the outside." Witness heard Pearce calling for help, saying, "Somebody come here." Pearce then said: "Boys, what happened?" Witness said: "You failed to take the siding, Bob." Pearce said: "Lord have mercy. Mr. Keith, Mr. Moss, and all concerned said we hold the main track." Keith was the regular engineer, and Moss the fireman, on the north-bound train. At the time Mr. Pearce made the foregoing statements, he was horribly mutilated, and in great pain. The witness did not know whether Mr. Pearce understood fully what he said, but thought he did not.

In view of the contention of plaintiff in error that the foregoing statements of R. M. Pearce were improperly admitted in evidence, we here express our opinion that they were properly admitted as a part of the res gestæ. We think this conclusion is confirmed by the following authorities: *Charleston & Western Carolina Ry. Co.* v. *Burckhalter,* 141 *Ga.* 127 (80 S. E. 278); *So. Ry. Co.* v. *Brown,* 126 *Ga.* 1 (54 S. E. 911); *Augusta Factory* v. *Barnes,* 72 *Ga.* 217 (5) (53 Am. R. 838); *Roach* v. *W. & A. R. Co.,* 93 *Ga.* 785 (21 S. E. 67); *Standard Oil Co.* v. *Reagan,* 15 *Ga. App.* 571 (84

S. E. 69) ; Penal Code (1910), § 1024. We would also say in this connection that we are quite sure that the jury had the right to conclude, from the statements themselves and the testimony of other witnesses, that Mr. Pearce knew what he was saying.

It is perfectly clear from the allegations of the petition and the evidence introduced that R. M. Pearce, as road foreman of engines exercised large supervisory powers over ordinary engineers, and that he was bound to know the general rules governing the conduct of engineers. We quote from General Rule No. 20 : "When a conductor or an engineman, or both, is relieved before the completion of a trip, all train orders and instructions held must be delivered to the relieving conductor or engineman. Such orders or instructions must be compared by the conductor and engineman before proceeding." General Rule No. 1326 provides: "When an engineman is relieved by another, they must exchange train orders and instructions and compare with conductor before proceeding." Clearly it was the duty of Mr. Pearce to see that the special orders were "delivered" to him, and clearly it was his duty, after getting the said orders, to compare them with the orders of the conductor. These special orders were of the utmost importance. Upon them depended the lives of many people. Under the foregoing rules there is no place for a mere verbal exchange of them. The conductor of train No. 2 had the special orders requiring his train to take the siding at Rockmart, and the engineer of that train had them. They could and should have been procured by Mr. Pearce, and they could and should have been compared with the conductor's orders "before proceeding." As we view the case, Mr. Pearce's failure to comply with rules, which he was bound to know, was the direct and proximate and sole cause of his death. If we are correct in this conclusion, the court erred in overruling the general grounds of the motion for a new trial; and we so hold.

We see no merit in the cross-bill of exceptions complaining of certain instructions of the court and of the admission of evidence.

*Judgment reversed on main bill of exceptions; affirmed on cross-bill. Broyles, C. J., concurs.*

BLOODWORTH, J., dissents from the judgment on the main bill of exceptions but concurs in the judgment on the cross-bill.