## 5475.  STANDARD OIL COMPANY *et al. v.* REAGAN *et al.*

1. Where oil sold as kerosene is used in starting a fire, by one who believes it to be kerosene, when it is in fact a more dangerous liquid and explodes when so used, its use for this purpose is not such negligence per se as would bar a recovery from the seller for resulting injuries to the person so using it.

(*a*) Whether kerosene oil could or could not be used with safety in a particular manner in starting a fire is a question for the jury.

2. "What is the res gestæ of a given transaction must depend upon its own peculiarities of character and circumstances. Courts must be allowed some latitude in this matter." *Mitchum* v. *State*, 11 *Ga.* 615, 623. "Declarations of a party, to be admitted as part of the res gestæ, must be at the time of the transaction they are intended to explain, must be calculated to unfold its nature and quality, and must harmonize with it." *Carter* v. *Buchannon*, 3 *Ga.* 513 (2).

(*a*) Declarations made by a wife to her husband, who had just reached her side, three or four minutes after a fatal injury, when she was still lying on the ground where she had been blown by the force of an explosion, surrounded by circumstances corroborating her statement, and with her person still smoking from the flames which consumed her clothing, may be treated as "part and parcel of the catastrophe," and may be admitted as part of the res gestæ, when there is nothing to indicate that they were prompted by device or afterthought.

3. Proof of a simple and primitive test, tending to indicate the actual identity of a substance by showing its characteristics in one or more particulars, may be introduced, and the jury may accord to it such weight as, from the certainty of the test, the degree of capacity required to make the test, and the capacity possessed by those making it, it is, in the opinion of the jury, entitled to receive—measured by the evidence, or by common knowledge so general as to be practically universal.

4. While evidence that one had used kerosene oil for many years in a particular manner might be no measure of diligence for another, who was fatally injured by using it in the same way, yet it might tend to indicate that the injured person was not guilty of gross negligence amounting to a lack of ordinary care 'in thus using it.

5. Where the age of a person is shown, his expectancy of life may be determined by the jury without any other direct evidence on the subject. Tables of the probable length of life and its probable worth may be useful, but are not conclusive or absolutely essential for that purpose. Upon proof as to a person's age, health, and earning capacity, the jury may estimate the value of his life, and reduce that value to its present cash value, by any method satisfactory to them which produces a definite result that is fair and reasonable and is authorized by the evidence.

6. When the jury disregard instructions from the court as to a method of calculation, and by some other method reach a result which is fairly deducible from the evidence, but different from what they might have reached by adopting the 'method suggested by the court, the verdict may nevertheless be sustained. It is immaterial how a result be reached, so that it is legal, just, and accurate.

7. The jury may increase damages awarded for death caused by wrongful act, by including in the total sum awarded legal interest, from the time of the death to the date of the verdict, on the cash value of the life of the deceased at the time of death.

8. The reasonably probable average earnings of the deceased may be deduced by the jury from evidence as to past earnings, and taking into consideration age and health, and the probable future increase in efficiency during future years, as well as the natural diminution in earning capacity, consequent upon old age.

9. In estimating the value of ordinary domestic service rendered by a wife, the jury are authorized to take into consideration what may be the value of many services incapable of exact proof, but measured in the light of their own observation and experience. "Some wives perform manual labor—others do not; yet the husbands of the latter no less than those of the former would certainly be entitled to compensation from wrong-doers for causing inability to perform service. . . There need be no direct or express evidence of the value of the wife's services, either by the day, week, month, or any other period of time, or of any aggregate sum." *Metropolitan St. R. Co.* v. *Johnson,* 91 *Ga.* 466, 471, 472 (18 S. E. 816).

10. The evidence authorized the verdict, and no substantial error was committed by the court.

DECIDED JANUARY 20, 1915.

Action for damages; from city court of Thomasville—Judge W. H. Hammond. December 6, 1913.

*Theodore Tilus, King & Spalding, E. M. Underwood,* for plaintiff in error.

*Roscoe Luke, Little, Powell, Hooper & Goldstein,* contra.

WADE, J. G. W. Reagan brought an action in his own behalf and as next friend for his minor child Ellis Reagan, against the

Standard Oil Company, J. W. Dillon, and Israel Bowdre, to recover damages on account of the death of Lula Reagan, his wife, whose death he alleged was caused by the negligence of the defendants. The petition as amended alleged that the Standard Oil Company was a dealer in illuminating oils on July 3, 1912, and was engaged in selling the same through J. W. Dillon and Israel Bowdre, its employees; and that on the day named Dillon, acting as its local manager, placed Bowdre in charge of a wagon loaded with both kerosene oil and gasoline, which was offered for sale to any who desired to buy; that Bowdre came to the petitioner's store and sold to him and placed in his kerosene tank ten gallons of a fluid which Bowdre stated, and which the petitioner supposed, was kerosene oil, but which in fact was gasoline, resembling kerosene oil in appearance, but a much more dangerous and a very much more explosive substance; that a day or two thereafter the petitioner drew out from the said tank about a gallon of what he supposed to be kerosene oil, but which was in fact a portion of the gasoline sold and delivered to him for kerosene by the defendants, and placed it in a small can and sent it to his home near by for domestic use; that several days thereafter, to wit, on the 18th of July, 1912, at or about ten o'clock in the morning, his wife put certain fuel in the stove in his home and lighted it with fire, and poured thereon some of the gasoline in the family oil-can, supposing it to be kerosene, when the gasoline exploded and set fire to the contents of the can, which also exploded, so that therefrom she was set on fire and received burns, from which she died about 4:30 o'clock, p, m., on the same day; that at the date of her death she was 24 years old and was in good health, and the value of her services was $100 per month, and she then had a life expectancy of 40 years; and that Ellis Reagan, was then an infant 17 months old, and was her only child. The petition further alleged that the death of Lula Reagan was occasioned solely by the negligence and wrong of the defendants in selling and in causing to be sold and delivered to the petitioner gasoline, which is a highly dangerous substance, liable to explode and cause destruction of human life and property, unless handled most carefully, and in selling the same for "fireproof" kerosene oil, which is a substance greatly resembling gasoline in its superficial appearance, but which is comparatively free from danger when handled in an ordinary manner, and in placing

it and causing it to be placed in the dispensing tank of petitioner, where he was likely to use it and to dispense it to his own family and to others; and that the wrongful act of the defendants in causing gasoline to be thus placed and delivered as kerosene, in such a manner that in the natural course of things, and in a way that could be reasonably expected, it came into the possession of Lula Reagan, and was used as kerosene by her without any knowledge on her part that it was in fact gasoline, was the direct, proximate, and natural cause of her death, and the negligence complained of was in law and in fact the negligence of each of the defendants and of all of them. The petitioner asked for damages in the sum of $20,000.

1. The defendants filed a demurrer, on the ground that the petition set forth no cause of action, because it appeared therefrom that the injury complained of was caused directly and proximately by the negligence of Mrs. Reagan, and that such negligence would prevent a recovery; and also because it appeared from the petition as amended that by the use of ordinary care Mrs. Reagan could have avoided the consequences of the alleged negligence of the defendants, and her contributory negligence would therefore prevent a recovery. These grounds are in effect repeated in somewhat different words, but no other point is raised by the demurrer. The precise issue, therefore, raised by the demurrer was that as a matter of law it is contributory negligence, amounting to a failure to exercise ordinary care, for one to attempt to build a fire with kerosene oil. In order to sustain this view we would be compelled to hold that, according to common knowledge, practically so universal as to amount to judicial notice, kerosene oil is a substance so highly explosive and so dangerous when brought into close proximity to fire that any person using and employing it to kindle a fire would be properly chargeable with the natural injurious results liable almost certainly to flow from such a reckless and negligent employment of so dangerous an agency. To the contrary, kerosene oil of the quality permitted under our statutes is in such general use for the purpose of kindling fires that the court might almost be prepared to hold as a matter of law that its use for such a purpose and under certain restrictions is not dangerous, but ordinarily is entirely safe. However, in the determination of this question we are not required to go so far, or in fact to go further than to hold that

the employment of kerosene oil in starting a fire is not such negli-
gence per se as would bar a person injured by an explosion there-
upon resulting from a recovery, upon proof that the grade of oil
was too low or that the substance sold as, used for, and supposed
by such person to be, kerosene oil, was not in fact kerosene oil at
all, but a more dangerous substance altogether.

In the case of Peterson v. Standard Oil Co., 55 Or. 511 (106
Pac. 337, 22 Ann. Cas. (1912A) 625), the Supreme Court of
Oregon held: "A complaint, alleging that F., a merchant, ordered
of defendant a certain kind of kerosene that would stand an open-
fire test of 120 degrees; that defendant negligently delivered to
him, in a tank marked as containing the article ordered, a distil-
late that would only stand a test of 88 degrees; that F., relying on
his contract and the label, sold some of it to plaintiff's intestate, as
the article ordered; that she, while trying to kindle a fire with it,
without negligence, was killed by an explosion which resulted; and
that, had it been as represented, no explosion would have resulted—
is sufficient, at least as against a general demurrer, without any
allegation of the dangerous character of such distillate; the court
taking judicial notice of its dangerous character, which is generally
known, and a quality of a substance that is taken judicial notice
of being in effect pleaded when the substance is mentioned." In
the present case the petition alleged distinctly that the gasoline
supplied to the plaintiff through the negligence of the defendant, in
lieu of the kerosene which he ordered and paid for, was in fact a
much more dangerous substance than that purchased. The point
was raised in the Peterson case, supra (by the answer of the de-
fendant), that the death of the plaintiff resulted from her own
negligence in using oil for the purpose of starting a fire, since
neither kind of kerosene mentioned in the plaintiff's complaint was
intended or manufactured to be used in this way, and therefore the
injuries resulting in her death were caused by her own want of care
and without fault or negligence of the defendant or any of its serv-
ants or agents. In the decision it was said: "The common knowl-
edge of the community is that its primary use is for the purpose
of illumination; that secondarily it is used in oil-stoves for heat-
ing purposes. It is also used for the purpose of removing grease
and oil from wood or iron, and for kindling fires, as well as for
many other purposes. Its use for any of these purposes is not un-

common, and we think that the employment of it for the purpose of kindling fires is not in itself negligence." The court quoted with approval from Ellis *v.* Republic Oil Co., 133 Iowa, 11 (110 N. W. 20), as follows: "The use of kerosene in kindling fires is too common and too well known for us to say that a person using reasonable care may not employ that agency without being chargeable with negligence."

In Ives *v.* Weldon, 114 Iowa, 476 (87 N. W. 408, 54 L. R. A. 854, 89 Am. St. R. 379), it appeared that the plaintiff was burned by the explosion of gasoline, which she was using for starting a fire, supposing it to be kerosene oil. A short time before she was injured her father went to the defendant's store with a jug, which he testified he directed the clerk to fill with kerosene oil, but the clerk filled the jug with gasoline instead. The jug was taken home by the father, and the plaintiff, supposing that it contained kerosene oil, poured some of its contents into a small can, and thence into the stove. She then applied fire thereto and it exploded, and set fire to her clothing. The right of the plaintiff to recover under these circumstances was upheld by the court.

In Riggs *v.* Standard Oil Co., 130 Fed. 199, where, in attempting to start the fire in a stove, one poured oil on wood which had been placed on top of a few live coals and an explosion resulted, it was held that there was such contributory negligence as would defeat recovery from the manufacturer of the oil for resulting injuries, on the ground that it was below standard test; and we may infer that, under this ruling, the manner in which the oil was used in starting a fire, or other conditions then existing, might in some cases determine whether or not there was contributory negligence on the part of the plaintiff in using it for such purpose. The petition in the instant case, as amended, alleges that the deceased "put certain material in the stove in petitioner's home, lighted it with fire, and poured thereon some of the gasoline which had thus been put in the family oil-can, supposing it to be kerosene." It does not appear from these allegations that the stove was already heated, or that there were any live coals under the lighted material. A distinction appears to be drawn in the several cases first referred to above and in the last case cited, between the effects properly to be expected where oil is first poured on the fuel and fire afterwards applied, and where the oil is poured upon a fire already lighted or

upon live coals, but we are not prepared to hold, either on the basis of common knowledge and experience or from such judicial declarations as may have been made by different courts, that there is such a radical difference in the degree of danger resulting from applying fire to kerosene oil and from applying kerosene oil to fire as would justify a holding that while the former would not involve such negligence as would amount to a lack of ordinary care, the latter would be such gross negligence as would bar a recovery. We think the whole matter should be relegated to the jury for determination, and a recovery would depend upon the evidence disclosing whether or not kerosene oil could be used with safety in the manner the petition alleges it was actually employed by the deceased; and therefore the court did not err in overruling the demurrer.

2.   The case as laid in the petition was supported by proof sufficient to authorize a verdict of $10,000 against the Standard Oil Company and Israel Bowdre—it being admitted by counsel for the plaintiffs that no case had been made out against the defendant J. W. Dillon, and the jury therefore finding in his favor. A motion for a new trial was made by both Bowdre and the Standard Oil Company, but it is unnecessary to discuss the general grounds of the motion, in view of the statement above made. Several amendments were made to the motion for a new trial, which we will discuss in the order in which they occur. The first ground of the amendment to the motion for a new trial was: "Because the following material evidence was illegally admitted to the jury by the court over the objection of movant, to wit: The deceased wife of plaintiff, G. W. Reagan, and mother of Ellis Reagan, said she was starting a fire in the stove, and had some chips in the stove, and, to start the fire to burning, she thought she would pour some oil on the chips, and when she did the fire went up in the can and burst all over her, just all in a second." Exhibit A of the motion, including a statement of evidence, was by reference made a part of this ground: "Before the witness was allowed to testify as to the declaration of Mrs. Reagan, the deceased, the following proof was adduced as showing or tending to show that the declarations were made as part of the res gestæ of the burning, to wit: That she (the deceased) died from burns received about ten o'clock in the morning, and that she died about four o'clock in the afternoon of the same day; that she was burned practically all over her body,

37

all the flesh and skin upon her entire person was burned. On the morning of the burning the witness, who was the husband of the deceased, was at his store between 200 and 225 yards from his residence, where the deceased was, when he heard a noise or explosion which went 'like an automobile goes sometime—kinder like a gun or pistol.' He was called home and went immediately, and when he got there found his wife on the ground in front of the kitchen door, burned all over from her head to her feet. The kerosene can which was exhibited in evidence was found lying on the floor, and the kitchen was all smoked up, the can being close to the kitchen stove, with its bottom blown out. His wife was lying just at the kitchen steps. The period elapsing between the time when the witness heard the explosion and when he got there to where his wife was was just a few minutes—three or four minutes—'just as quick as he could get there.' When the witness got there the deceased was on the ground talking—seemed to be suffering a lot of pain; she was conscious and talking freely. She was talking about dying and said she didn't want to die, on account of her husband and baby. She was not giving any signs of pain, only you could look at her and tell—her hands were stiff and she was burned mighty bad. There was mighty little clothing on her, but there had been a quilt spread over her and water poured over her—she was burned and parched all over. Her clothing was smoking and steaming when the witness got there, but the fire was out. The distance from the house to the store was not over 200 or 225 yards. and the witness ran there hurriedly—as fast as he could, and when he got there he asked what the matter was, and, in reply to his question, the deceased made the statement excepted to in paragraph one of the amended motion of which this exhibit forms a part." The defendant objected to the admission of this evidence, on the ground that it was irrelevant and immaterial, was hearsay, and did not constitute a part of the res gestæ of the case. In his cross-examination the witness Reagan said: "With reference to the statement which I claim my wife made to me as to how this accident occurred, first. I asked her how it happened, and she stated she had started to make a fire in the stove, and that she had put some wood in the stove, and had some chips under the wood, and had lighted the chips. under the wood, and that after she had lighted the chips under the wood she poured the oil out of the can on the wood, and

the fire followed the oil up into the can. The fire followed the oil up the stream to the can, and when the fire followed from the chips up the stream to the can, the can exploded; that is the statement she made to me." It certainly can not be seriously contended that the evidence objected to was immaterial and did not relate to the question at issue; so the only objection we shall discuss is the point that the evidence was not a part of the res gestæ.

Our code provides that "Declarations accompanying an act, or so nearly connected therewith in time as to be free from all suspicion of device or afterthought, are admissible in evidence as part of res gestæ." Civil Code, § 5766. The general principle of this exception to the hearsay rule "is based on the experience that, under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or, at least, as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to the facts just observed by him; and may therefore be received as testimony to those facts." 3 Wigmore on Evidence, § 1747. "The utterance, it is commonly said, must be 'spontaneous,' 'natural,' 'impulsive,' 'instinctive,' 'generated by an excited feeling which extends without let or break-down from the moment of the event they illustrate.'" Id. § 1749. "There must be some shock, startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting. The utterance must have been *before there has been time to contrive and misrepresent,* i. e. while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance. This limitation is in practice the subject of most of the rulings. It is to be observed that the statements *need not be strictly contemporaneous* with the exciting cause; they may be subsequent to it, provided there has not been time for the exciting influence to lose its sway and to be dissipated." Id. § 1750. "If the declara-

tions appear to spring out of the transaction, if they elucidate it, if they are voluntary and spontaneous, and if they are made at a time so near to it as to preclude reasonably the idea of deliberate design, then are they to be regarded as contemporaneous." *Mitchum* v. *State,* 11 *Ga.* 615-627. "What the law altogether distrusts is not afterspeech but afterthought. . . That they [the declarations] shall be or appear to be spontaneous is indispensable, and it is for this reason alone that they are required to be speedy." *Travelers Ins. Co.* v. *Sheppard,* 85 *Ga.* 751, 775, 776 (12 S. E. 18). It is well settled that there can be no definite and fixed limit of time, but that each case must depend upon its own circumstances; "for what is the res gestæ of a given transaction must depend upon its own peculiarities of character and circumstances. Courts must be allowed some latitude in this matter." *Mitchum* v. *State,* supra, 623.

It can not be maintained, as a reasonable or logical deduction, that, simply on account of the fact that the statement of the deceased as to how she sustained the injuries from which she was then about to die was made in response to an inquiry from her husband, who arrived at the scene of the tragedy in three or four minutes after the fatal explosion occurred, her account of the burning was not spontaneous. The natural question propounded by her husband may have directed her mind to the details of the accident, and her wavering attention may have been thereby fixed upon the immediately preceding occurrence long enough to enable her to give an account of the happening, but, from the simple question the distressed husband put to his dying wife, we can not by any stretch of imagination discover anything calculated to direct her thoughts to any particular line of explanation, or to suggest to her mind any device or afterthought whatsoever. To the contrary, the inquiry from the husband under such circumstances must have been irresistibly compelled by the promptings of affection and even by the ordinary feelings of humanity. And so too the reply of the wife, offering an explanation of her condition, must have welled up spontaneously to her lips at sight of her husband and even without any inquiry from him.

It was held in Galveston *v.* Barbour, 62 Tex. 176 (50 Am. R. 519) that declarations made by a child, in a childlike manner, to its mother, where he came home immediately after he received an

injury, crying, and smarting from the pain resulting from it, making known to her how he had been hurt, were admissible. Equally natural, it appears to us, would be declarations made by a wife to a husband, three or four minutes after a fatal injury had been inflicted upon her, and immediately after he reached her side, when she was still lying on the ground where she had been blown by the force of an explosion, with her person still smoking from the flames that consumed her clothing. It is both unreasonable and unnatural to suppose that the statement of the injured woman, horribly burned but three or four minutes before, and even then trembling on the verge of eternity, could have been prompted by a conscious thought of possible pecuniary damages to be recovered from any one, and tainted with the suspicion of device or afterthought; and in fact it is almost impossible to imagine that the injured wife and mother, recognizing the approach of the fell destroyer death, and declaring her willingness to die, but lamenting that she must leave her infant son and the husband of her choice, could have entertained even for a moment such sordid considerations. Though racked by physical torture, her thoughts were on the heights, and she was gazing upward and unafraid into the undiscovered future then opening before her, and not downward into the valleys of human littleness, weighing the dross of worldly wealth, or estimating the possibilities of recoverable damages!

"Res gestæ are the circumstances, acts and declarations which grow out of the main fact, are contemporaneous with it, and serve to illustrate its character. Declarations of a party, to be admitted as part of the res gestæ, must be at the time of the transaction they are intended to explain; must be calculated to unfold its nature and quality, and must harmonize with it." *Carter* v. *Buchannon, 3 Ga.* 513.

The case of *Ferguson* v. *Columbus & Rome Railway, 75 Ga.* 637, appears to be exactly in point. The first headnote of the decision is as follows: "Where a child of ten years of age was seriously injured at a turntable belonging to a railroad, and a witness who reached the spot a few minutes after the injury occurred, and who testified to circumstances tending to show that the turntable was the instrument by which the child was hurt, such as the appearance of fresh, warm blood, and pieces of flesh, torn from her limbs, being on the machine and in the pit under it and on the ends of the

rails, it was error to refuse to allow such witness to testify what the child said when he reached the place, as to how she was hurt. Such statements were part of the res gestæ. Nor did it matter as to their admission whether the child lived or died."

In *Augusta Factory* v. *Barnes,* 72 *Ga.* 217 (53 Am. R. 838), a statement made to the plaintiff by his injured daughter on his return to his home, where she had been carried from the factory directly after she had been wounded, as to how the injury occurred, was admitted by the court, though about a half hour had elapsed between the time of the injury and the statement. The statement was offered as part of the res gestæ, and the court said that the fact "that the statement was made at a different place from that at which the injury occurred, and after the lapse of some short time, if there were nothing else connected with it, would hardly afford a plausible ground for its rejection; but considering the circumstances, the terrible suffering the child was then and had been enduring from the frightful injury that had so recently occurred, we think a case was presented where a judge should have paused long before rejecting it; the propriety of the rejection would have been, to say the least, doubtful, and in cases where the competency of evidence is doubtful, it should go to the jury, that they may consider how far its force is impaired by these incidents." In discussing the admissibility of certain declarations, in *Goodman* v. *State,* 122 *Ga.* 111, 118 (49 S. E. 922), the Supreme Court said: "At most we think it could only be said that their admissibility was doubtful, and it has long been the rule in this State, when the admissibility of evidence is doubtful, to admit it and leave its weight and effect to be determined by the jury." See also cases there cited.

Counsel for the plaintiff in error contend that the statement of Mrs. Reagan to her husband was inadmissible because it was a narrative statement detailing the manner in which she was injured, made after the transaction was over, and hence was no part of the res gestæ. "While as a general rule that which is mere narrative is apt to carry with it the impress of afterthought, there may be a narrative which is entirely free from afterthought." *Southern Ry. Co.* v. *Brown,* 126 *Ga.* 4 (54 S. E. 911), and cit. The case of *Mc-Bride* v. *Georgia Railway & Electric Co.,* 125 *Ga.* 515, 517 (54 S. E. 674), is cited by counsel for the plaintiff in error. It ap-

pears, however, that in that case a narrative statement was made not only some minutes after the transaction was over, but after the plaintiff had walked away from the place where the injury was inflicted to her intended destination, two or three hundred yards away. Also, it does not appear in that case that the person making the statement was suffering such extreme agony, or was in the stress of such nervous excitement, as would still the reflective faculties and remove their control, so that her utterances might be considered as "a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock." Quite different are the facts in the present case, where the injured person made the statement objected to at the scene of the injury, within three or four minutes after the explosion occurred, and while writhing in agony and surrounded by physical evidences which agreed with and corroborated what she said.

In *White* v. *Southern Railway Co.*, 123 *Ga.* 353 (51 S. E. 411), also cited by the plaintiff in error, the plaintiff offered to prove as part of the res gestæ of the occurrence a statement made by her son half an hour after the train which injured him had departed, and also a statement made by him on the morning of the day following his injury, in the presence of a physician and of an agent of the company, who reduced to writing what he said concerning the manner in which he got hurt. There the second statement was made not only some time after the infliction of the injury, but away from the scene of its occurrence, and under circumstances calculated to direct the attention of the injured person to the legal consequences which might depend upon his explanation of the manner in which he was injured; for not only were his mother and his physician present, but an agent of the company was also there at the time, reducing to writing what he had to say, and thus necessarily emphasizing its importance and possible effect; and his first statement was a narrative to two passers-by, who discovered him half an hour after his injury and after the train inflicting the injury had departed.. Neither does it appear that the injured person was suffering any pain at the time he made either statement offered as part of the res gestæ, but the shock of the accident may have numbed his capacity for suffering and left his mind undisturbed, clear, and calculating; and, while he died soon after the second statement was made, he may nevertheless have been unaware of his

approaching dissolution, and his thoughts therefore may have rested upon the possible material results of the accident.

In *Western & Atlantic R. Co.* v. *Beason,* 112 *Ga.* 553, 557 (37 S. E. 863), it was held that the trial court erred in permitting two witnesses to testify to accounts given to them by the deceased after he had fallen from a train, touching the place upon the train where he had been riding, and explaining the manner in which he was thrown to the ground and injured. The court declared the evidence should have been excluded, since what the injured man said to the witnesses was manifestly a mere narrative of a past occurrence. "His statements, notwithstanding the fact that he was suffering great pain, were made deliberately and connectedly. They were in no sense exclamatory, and manifestly did not proceed from him *as part and parcel of the catastrophe* [italics ours]. It is true these statements were made within a few minutes thereafter; but, in determining whether declarations should be received as a part of the res gestæ of an occurrence, the mere question of the lapse of time is not controlling. The real test is: Were the declarations a part of the occurrence to which they relate, or were they a mere narrative concerning something which had fully taken place and had therefore become a thing of the past?" It does not appear in that case whether the statements were made at the place where the injury occurred, or whether the train from which he fell was at the scene or had disappeared in the distance; and therefore the declarations could scarcely be considered in any view as part of the occurrence to which they relate—they were not "part and parcel of the catastrophe." Quite different are the facts in this case; for while it appears that the statements made by Mrs. Reagan were perhaps made connectedly, and it does not appear that they were in any sense exclamatory, nevertheless they were made not only within three or four minutes after the explosion which caused her death, but at the scene of the tragedy, while she was resting on the ground within a few feet of the wrecked stove, with the fatal oil-can lying near, and with the smoke still rising from her charred person and burnt clothing. It was something more than a mere narrative, connected and deliberate; and though her statements may have related to something which had occurred an infinitesimal time before, it could hardly be characterized as a past occurrence only, though in a sense finished and completed. The reverberations from

the explosion could scarcely have died in her ears, the smoke of the flames was still rising, and she was at the exact spot of the tragedy, surrounded by circumstances corroborating her story.

3. Grounds 2, 3, 4, and 5 of the amendment to the motion for a new trial assign error because the court admitted in evidence the following testimony, to wit: (2) "They poured some of the other oil in an oyster or sardine can and struck a match and stuck in it, and it put it out; but this oil he took out of my tank, they didn't have to put the match to it, because it would catch before the match got close to it." (3) "He poured some ordinary kerosene oil into a can for testing purposes." (4) "I saw a lighted match applied to the ordinary kerosene. Well, they wasn't no ways alike. You would have to hold the match to it before you could get it to catch, and if they stuck the match in it, it would put it out. You could not do this with the oil taken from my tank." (5) "I have been using kerosene all my life in making fires, and we have been using it there working for the railroad company in starting the fires, putting the wood and chips down first, and then we take the can of oil and pour in there on it after the fire has been started, and in all my experience with kerosene I never have seen any act like that did." The plaintiff in error complains that the evidence set forth in grounds 2 and 4 was irrelevant and immaterial, and that no proper foundation for proof as to the making of the experiments therein referred to had been laid, because it was not shown that the party making the experiments had sufficient capacity or means suitable for making them. The evidence set forth in the 3d ground is objected to for the reasons assigned in the 2d and 4th grounds, and for the additional reason that the opinion of the witness as to what is ordinary kerosene was thereby admitted. The evidence set out in the 5th ground is objected to on the ground that it was irrelevant and immaterial, and set forth a wrong standard to use in determining the question of negligence.

The question at issue was whether or not gasoline, a substance alleged to be more explosive and very much more dangerous than kerosene, had been sold and delivered by the defendant, through its agents and employees, for and instead of the kerosene actually ordered and paid for by the plaintiff; and, to determine this question, any evidence tending to show that the liquid sold and delivered to Reagan was more inflammable, explosive, or dangerous

than kerosene, and was different from kerosene, was clearly admissible as a circumstance to be considered by the jury in determining the identity of the liquid taken from the tank of the plaintiff (which was purchased from the defendant), and any test, no matter how simple and primitive, which would tend to establish the existence of such a difference would therefore be admissible. The fact that "ordinary" kerosene was more difficult to ignite or was less inflammable than the liquid sold to Reagan may not have been conclusive as to the absolute nature and character of the liquid— whether gasoline or not, but certainly was a circumstance tending to establish the contention of the plaintiff that the liquid was in fact gasoline, and distinctly corroborated the testimony of the witness Billings, who said he was in the automobile business and had used gasoline and kerosene in launches, motor-boats, and automobiles for twenty years, and testified directly and positively that some of the liquid, shown by other testimony to have been obtained from the tank of the plaintiff and to be a part of what was sold to the plaintiff by the defendant company, was in fact and in truth gasoline or had gasoline in it. That a simple test was made with fire only is no reason why this evidence should be entirely without probative value. A chemical analysis alone, for instance, would accurately determine many of the differences between black sand and ordinary black gunpowder, with grains of approximately the same size, and yet, if a witness swore that though he had analyzed neither, he was entirely familiar with ordinary black sand, with its qualities and characteristics, and he had applied fire both to a small quantity of sand and to a substance resembling both sand and gunpowder, which last exploded, while the sand did not, and from this fact he was ready to assert that the substance resembling gunpowder was not sand, since it behaved in a different way when fire was applied thereto from any ordinary sand he had ever seen, and was an explosive acting in no sense like sand, could it be said that this testimony would be of no probative value, or would be irrelevant and immaterial in determining whether or not the substance sold for sand, but resembling gunpowder, was in fact not sand, but probably gunpowder? We therefore can not see any force in the objection that the tests referred to in these excerpts from the evidence were not made by a person of sufficient capacity or sufficient means for making the experiments. It is evident that no

great degree of capacity and nothing more elaborate than a match, together with two cans, each containing a portion of one of the two different liquids, would be requisite to accomplish the tests made. Nor do we see any force in the objection that, since the evidence in the case indicated that the liquid in question was poured upon chips in a stove to which fire had already been applied, testimony showing that ordinary kerosene in an open vessel would not catch readily from a match, but the liquid sold to the plaintiff and represented to be kerosene would catch when the same test was applied thereto, was irrelevant. Irrespective of whether the tests with the match and cans full of the liquid taken from Reagan's tank and full of "ordinary" kerosene actually duplicated the conditions which the deceased stated existed at the time of her injury, these tests would demonstrate the comparative inflammability, explosiveness, and dangerous nature of kerosene and of the fluid delivered to Reagan for kerosene, and tend to establish the real identity of the latter.

The objection that by admitting the testimony set out in the 3d special ground the court allowed the opinion of the witness as to what was "ordinary kerosene" to go before the jury is, we think, also without merit; since it must be conceded that commercial kerosene is a substance in such general, if not universal, use that the term "ordinary kerosene" has a meaning almost as well understood as the terms "ordinary wood," or "ordinary water," or "ordinary air" would have. So that we must assume that this expression meant kerosene of the grade and quality ordinarily sold for the general use of the public for illuminating purposes, and of the kind and quality with which the witness and the public at large were familiar. Besides, we must presume, in the absence of anything to the contrary, that "ordinary kerosene," being the kerosene sold in the open market, is kerosene of lawful grade, and hence of the quality which Reagan sought to purchase, and which the other persons making the tests had actually purchased, both from the Standard Oil Company and from other manufacturers of oil.

4. The testimony objected to in the 5th ground of the amendment to the motion for a new trial was not subject to the objection made. The witness (Welch) stated that he actually saw tests made of oil said to have been drawn from Reagan's tank (and which other

testimony showed had actually been drawn from this tank), and that a lighted match placed near the oil from Reagan's tank would ignite, whereas kerosene oil would "not do that way." The witness said he saw the liquid from Reagan's tank ignited by merely holding a lighted match close thereto. He further said that he had had experience in the handling of ordinary kerosene oil, and had practically used kerosene in building fires every day for several years, and had been using it all his life in making fires; that he had been using it in working for a railroad company, starting the fires by putting down wood and chips first, and after the fire had been started pouring oil upon it from a can, and in all his experience with kerosene he had never seen any kerosene act as did the oil taken from Reagan's tank, which "was either all gasoline or had a good portion of gasoline in it." He further said that the oil which came from Reagan's tank would flame up, but none of the oil that came from the other stores would act in this manner; that the Reagan oil would burn on the ground if poured out, and the oil obtained from other places would not burn under like conditions. The fact that Welch, without injury to himself, built fires in the identical manner in which Mrs. Reagan built the fire would not necessarily be a measure of diligence for her, but his evidence that he built fires day after day for many years in this manner without suffering any injury might tend to indicate that Mrs. Reagan was not guilty of negligence amounting to a lack of ordinary care in attempting to start a fire with what she had reason to suppose was kerosene, in the identical manner so often employed with safety by Welch. The testimony appears to be amply sufficient to support a finding that the substance sold and delivered to Reagan was not ordinary lawful kerosene, but was something more highly explosive and very much more dangerous, and was in fact either in whole or in part gasoline. Without attempting to set out all the testimony supporting this view, we may say generally that in addition to the plaintiff himself, eight witnesses, who so far as the record discloses are both reputable and disinterested, testified concerning experiments made with the oil shown to have been obtained from Reagan's tank and to be a part of the liquid sold to him by the defendant company, and each and all of these witnesses testified in effect to the same state of facts, and by their evidence demonstrated clearly that the oil from the plaintiff's

tank was far more inflammable than ordinary kerosene oil. In this connection we may add that the witness Knight testified that he purchased some oil from the plaintiff about the time the wife of the latter died, and that he poured some of it in a common glass lamp, which he had used in his home for burning kerosene for 3 or 4 months, and that when he "stuck a match to it it bursted."

5-10. The 6th ground of the amendment to the motion for a new trial complains that the court erred in charging the jury that in the event that the plaintiff was entitled to recover, the amount of the recovery should be "the full value of the life of said deceased as shown by the evidence, the full value of the life of the deceased as shown by the evidence being the full value of her life without deduction for necessary or other personal expenses of said deceased had she lived." This charge was objected to (a) because it was "not a correct statement of the law and is erroneous and incomplete;" (b) because there was no evidence to support the charge, there being no competent testimony upon which the jury could find the value of the life of the deceased; (c) because it was too vague, indefinite, and confusing, and did not furnish the jury any proper method or standard for ascertaining the value of said life; and (d) because the judge did not thereby or elsewhere in his charge furnish the jury with any proper method or standard for arriving at the value of the life of the deceased. It does not appear from any specific assignment of error wherein the charge is "not a correct statement of the law," or for what reason it is "erroneous and incomplete," and hence exception a need not be considered or discussed. As to the exception b—that there was no evidence to support this charge—we think this objection is not well taken, since the testimony of the plaintiff and of several of the witnesses for the defendants certainly afforded the jury competent evidence upon which they might find and determine the value of the life of the deceased. The plaintiff testified that his wife did all the housework, nursed his baby, cooked his food, and did the sewing for the household, and, in addition to all this, helped him in his store. He further said that to procure the services of a cook to do such cooking as his wife did would cost $5 or $6 per month or more—at least that much; that it would cost $4 or $5 per month for a nurse for his child; that the family sewing would cost something, but he was unable to say how much; that it would cost $6 or $7 per month

to get a housekeeper; and to procure a person to help him in his store as his wife did would cost him $25 or $30 per month or more. Spence, a witness for the defendant, testified that the services of a cook in the neighborhood where the plaintiff lived would be worth from $1.50 to $2 per week, that a nurse would be worth "about the same thing as a cook," and that a housekeeper would, in his opinion command a salary of $10 per month, or more. Bulloch, another witness for the defendant, estimated the services of a nurse for a child about the age of the plaintiff's infant son to be worth $1 per week, and stated that it would cost from $1.25 to $1.50 per week to do the sewing for a family of three like the family of the plaintiff. The jury, of course, had the right to take the highest value shown, and thus, under the testimony of the plaintiff, might have found that the value of Mrs. Reagan's services in his store were worth $30 per month or $360 per annum, and could have concluded, under the testimony of Spence, that her services as a cook were of the value of $2 per week for 52 weeks in each year, or of a total value of $104 per annum, and also a like sum per annum as a nurse; and that her services as a housekeeper were worth $10 per month or $120 per annum. And under the testimony of Bulloch the jury could have found that the services of the deceased in sewing were worth $1.50 per week or $78 per annum. These amounts added together would give the following results:

As a nurse, by the evidence of Spence..........$104 per annum  
As an assistant in his store, by the evidence of the  
     plaintiff ..............................  360 per annum  
As a cook, by the evidence of Spence...........  104 per annum  
As a housekeeper, by the evidence of Spence ....  120 per annum  
As a seamstress, by the evidence of Bulloch .....  78 per annum  

Total value of services per annum ............$766.

So that, according to this testimony, which the jury had the right to accept and believe, the services of the deceased might have been worth $766 per annum; and, taking into consideration the proof that she was less than 24 years of age at the time of her death, and was an active and healthy woman, and considering in the light of human experience her long natural expectancy, there was ample evidence to demand a charge concerning the gross and present value of her life.

The charge complained of gives the measure of damages in a homicide case as laid down in section 4425 of the Civil Code; and if it fails to furnish the jury with such methods or standards for ascertaining the value of the life of the deceased as to the plaintiff in error appeared to be necessary, a special request in writing for a more specific charge should have been made. Certainly there is nothing vague, indefinite, or confusing in the simple words of the statute which the trial judge embodied in this excerpt from his chargè. Where the age of the person in question is shown, expectancy of life may be determined by the jury without having the mortality tables before them, or without any other direct evidence on the subject. *Atlantic Coast Line Railroad Co.* v. *Moore,* 8 *Ga. App.* 185 (68 S. E. 875). See also *Boswell* v. *Barnhart,* 96 *Ga.* 521 (23 S. E. 414); *Merchants & Miners Trans. Co.* v. *Corcoran,* 4 *Ga. App.* 654, 669 (62 S. E. 130). Tables of the probable length of life and its probable worth may be useful, but are not conclusive or absolutely essential for that purpose. *Savannah, Florida & Western Railway* v. *Stewart,* 71 *Ga.* 427; *Central Railway Co.* v. *Perkerson,* 112 *Ga.* 923, 936 (38 S. E. 365, 53 L. R. A. 210); *Atlantic Coast Line Railroad Co.* v. *Moore,* 8 *Ga. App.* 185, 196 (68 S. E. 875); *Augusta Ry. Co.* v. *Glover,* 92 *Ga.* 132 (13) 148 (18 S. E. 406). In the absence of any testimony other than that as to the age of the deceased, her health, and her earning capacity, any fuller instruction by the court to the jury concerning the methods to be used in determining the value of her life was not necessary, no such instruction being requested.

The 7th ground of the amendment to the motion for a new trial assigns error on the following charge of the court: "When you ascertain what was the gross amount of the value of that life, you will reduce that amount to its present cash value, figured at the rate of seven per cent. per annum. The present worth of a given sum is arrived at by dividing it by $1 plus the legal rate of interest, 7 per cent. for the given time." The instruction *as a whole* is excepted to; and, since the first part of the second instruction, which directs the jury to reduce the gross amount of the value of the life of the deceased to its present cash value, is not erroneous, it is unnecessary to consider the various general objections urged thereto. *Anderson* v. *Southern Ry. Co.,* 107 *Ga.* 501 (4c) (33 S. E. 644). However, it does not appear to us that there was any error harmful

to the defendants in this charge, for had the jury estimated the present cash value of the life of the deceased by taking "the gross amount of the value of that life" and "dividing it by $1 plus the legal rate of interest, 7 per cent. for the given time," they would have been compelled to find a verdict of much less than the verdict returned (on a basis of $766 per annum), interpreting the instruction to mean that the gross amount should be divided by $1 plus 7 per cent. on $1 for the entire life expectancy of the deceased; or, in other words, that the gross value, which the jury might have found to be $30,640 (at $766 per annum for 40 years, had they fixed the expectancy at 40 years), should be divided by $1 principal, plus $2.80 interest on $1 at 7 per cent. for 40 years, or by a total of $3.80, which would have given a present cash value of only $8,063.15—more than $1,000 *less* than the result reached by use of the annuity table! If this instruction was misleading and harmful to any one, it certainly could not have been harmful to the defendants, since the jury reached a result greater than could have been reached had they followed the method suggested by the court.

The 8th ground of the amendment to the motion for a new trial complains that the court erred in charging the jury as follows: "If you find that both the deceased and the defendants, the Standard Oil Company and its alleged employees, were guilty of negligence contributing to the inflicting of the injuries on the deceased, such as are claimed in the petition herein, but if you find that the deceased's negligence was not equal to or greater than that of the defendants, and that the deceased, by the exercise of ordinary care, could not have avoided the consequences of the defendants' negligence after it became apparent to the deceased, if it became apparent to her, or in the exercise of ordinary care on her part, she could have discovered it, the plaintiff may nevertheless recover, but in that event the damages should be diminished by the jury in proportion to the amount of default attributable to the deceased;" the alleged error being that the charge was not a correct statement of the law, as it authorized a finding against the defendants although the negligence of the deceased may have been greater than that of the defendants; and that it was not applicable to the evidence, and there was no evidence upon which to base it, and it did not state the law as to contributory negligence, and was not a correct state-

ment of the law of negligence applicable to the issues in this case. There is no merit in the contention that this instruction was not applicable to the evidence. In what manner the excerpt complained of is "not a correct statement of the law," or wherein it fails to correctly state the law with reference to contributory negligence, or to state the law of negligence. applicable to the issues in this case, can not be determined from the exceptions, and the only remaining exceptions which it is necessary to consider are the exceptions which raise the point that this charge authorized the jury to find against the defendants although the negligence of the deceased may have been *equal to* or may have even *exceeded* the negligence of the defendants.

A close examination of the charge complained of will demonstrate that these exceptions are without substantial merit, since the court charged the jury that if they should find "that the deceased's negligence *was not equal to or greater* than that of the defendants" (italics ours), etc., the plaintiff might nevertheless recover. This plainly amounted to an instruction that the jury might find for the plaintiff if the negligence of the deceased was *less* than that of the defendants. See *Central Railroad & Banking Co.* v. *Newman,* 94 *Ga.* 560 (21 S. E. 219); *Dempsey* v. *City of Rome,* 99 *Ga.* 192 (27 S. E. 668); *Southern Railway Co.* v. *Watson,* 104 *Ga.* 243 (30 S. E. 818); *Wrightsville & Tennille Railroad Co.* v. *Gornto,* 129 *Ga.* 204 (58 S. E. 769).

The 9th ground of the amendment to the motion for a new trial is that the verdict for $10,000 is excessive and should be set aside because there is no evidence to support the same and it is so unreasonable as to show that it was the result of passion, prejudice, partiality, or undue bias on the part of the jury. This court would be loath to set aside any verdict upon such a ground, unless the record made it clear and unmistakable that in fact the verdict was unfair and excessive, or was plainly produced by prejudice, passion, or undue bias on the part of the jury. A careful inspection of the record in this case does not bring us to this conclusion. There was in our opinion ample testimony to sustain the verdict rendered; and who can say that the estimate placed by the jury upon the value of the life of the deceased was excessive, in view of the undisputed testimony showing her youth, health, and earning capacity, and taking into consideration the long stretch of years

38

which lay before her when the tragedy (which the jury found had been brought about by the gross negligence of the defendants) cut short her days and deprived her son and husband of the value of her actual manual labor, as well as of her tender ministrations, unselfish devotion, and countless loving services. We may not go beyond the bald proof in the case and outside of common experience, or consider from the standpoint of sentiment the priceless value of a wife and mother, but having only in mind the evidence which tends to indicate the present cash value of that life, we can not on this ground set aside the verdict returned.

It does not appear from the record that the mortality tables or the annuity table (70 *Ga.* 844 et seq.) were any of them introduced in evidence, but as said before, it is well settled that the jury is not restricted to the use of these tables or of any of them in determining the life-expectancy of any person or the cash value of a life, or bound by the results to be reached thereby, but may determine from other circumstances in proof,—as for instance the age, health, etc., of the deceased,—what such value and expectancy might be. The tables not being in evidence, the court of course, could not properly instruct the jury in regard to their use.

In the case of *Savannah, Florida & Western Railway* v. *Stewart,* 71 *Ga.* 427, 446, Chief Justice Jackson, in specially concurring for the majority of the court, said: "I do not think that there is any Procrustean rule in the mode of estimating the value of a life. The age of a man, the health he enjoys, the money he is making by his labor, his habits, are data from which the jury may argue how long he will probably live and work, and what his life is worth to his wife in its pecuniary value. I know of no law which requires tables of the probable length of life and its probable worth to be introduced. They may be a useful circumstance, but are not conclusive or absolutely essential." In *R. & D. Railroad Co.* v. *Allison,* 86 *Ga.* 145, 148, 149 (86 S. E. 145, 11 L. R. A. 43), Justice Simmons said: "This court has considered this question upon different occasions, and in several cases has said that there is no 'Procrustean rule,' or fixed rule, in cases of this kind." And in the same case it was further said: "It may be said, however, that the life tables put in evidence would show a man's expectancy of life, and that the amount he was earning at the time he was injured would be a sufficient basis upon which to prescribe such a rule; but

we do not think that this would in all cases be fair either to the plaintiff or to the railroad company. If the plaintiff were a young man of character, capacity and industry, and had chosen his occupation and commenced its pursuit, his yearly income at first might be small, but in a few years he might be able to increase it very largely; yet, under the rule contended for, he would be confined during his life to the small income he was making at the commencement. On the other hand, if the plaintiff were an aged or a middle-age person making a large yearly income, it would be unfair to the railroad company to take that income and his expectancy of life as the sole basis to determine the amount of his recovery; because our experience shows that a man in declining years has not ordinarily the same capacity to labor and earn money as a young man. It is then that sickness, inability and indisposition to labor come upon him more and more each year as he grows older. These and like facts should then be taken into consideration by the jury in behalf of the railroad company. None of these things can be proved with such exactness as would authorize a court to prescribe a fixed rule. As was said by the Supreme Court of the United States in Vicksburg, etc. R. Co. *v.* Putman, 118 U. S. 554 (7 Sup. Ct. 2, 30 L. ed. 257) : 'It has never been held that the rules to be derived from such tables or computations must be the absolute guides of the judgment and the conscience of the jury.'" In *Augusta &c. Railway Co.* v. *Glover,* supra, the Supreme Court said that a charge which in effect limited the jury to the consideration of the life and annuity tables was subject to misconstruction, for "neither here nor elsewhere was the charge quite full enough as to the right of the jury to avail themselves of facts in the evidence irrespective of the mortality tables." In *Boswell* v. *Barnhart,* supra, it was said that "there was evidence that the deceased was 38 or 40 years old at the time of his death, and that when he was sent to the chain-gang he weighed 195 pounds, was able-bodied, and, according to the testimony of several witnesses, was worth about $100 a year as a laborer. This evidence furnished a sufficient basis for an estimate as to the probable value of the life of the deceased."

We may test the verdict returned in several ways: The annuity table on page 847 of the 70th *Ga. Reports* fixes 12.037 as the sum to be multiplied by the annual earning capacity of a person 24

years old, in order to ascertain the present cash value of such a life; and this, multiplied in the instant case by $766, as the proved earning capacity of the deceased per annum, would produce a result less than $10,000, or only $9,220.34, which is considerably less than the amount of the verdict returned. On the other hand, while the Carlisle mortality tables give the life-expectancy of a person 24 years of age as 38.59 only, the jury may have concluded that the expectancy of Mrs. Reagan exceeded this number of years, and, under the facts in evidence, might amount to 40 years, as alleged in the plaintiff's petition, since the results given and the methods suggested in the mortality and annuity tables are not binding and conclusive, even where the tables are in evidence.

It is true it appears from the 7th ground of the amendment to the motion for a new trial that the judge instructed the jury as to the use of one method suggested by him for arriving at the cash value of the life of the deceased, and, had the jury strictly followed the instructions given them, they could not, under the evidence (unless they had estimated the life-expectancy of the deceased beyond the 40 years alleged, or had estimated her earning capacity above $766 per annum), have found a verdict for as much as $10,000; for, allowing that the expectancy would be 40 years, the gross value of the life of the deceased at $766 per annum would be $30,640, and this sum, divided by $1 plus the interest on the sum of $1 for 40 years at 7 per cent. or by 3.80, would make the cash value of the life of the deceased only $8,063.15. However, it must be borne in mind that the jury were seeking to determine the cash value of earnings amounting to $766 per annum for a period of about 40 years, or, to put it differently, the present cash value of an *annuity* of $766, payable during a fixed period of about 40 years, and that the present cash value of a *lump sum* due and payable at the *expiration* of 40 years from a given date would be quite different and *much less* than the actual present cash value of the same sum payable in *yearly installments* during a like period of 40 years. To illustrate the difference we have in mind, the present cash value of an annuity of $1 for a term of 40 years at 5 per cent. properly compounding the interest, would, according to a table in Merriman's "American Civil Engineers' Pocket Book" (John Wiley & Sons, New York, 1911), p. 1144, be $17.159; whereas the present value of a lump sum of $40 (the aggregate

sum of $1 per annum for 40 years) would, according to the method suggested by the court, at 5 per cent. simple interest, amount to $13.333 only.

Again, suppose, by way of further illustration only, the jury found the expectancy of the deceased to be 40 years, and concluded that her annual prospective earnings would average considerably less than the highest cash value proved at the time of her death, and, while adopting the suggestion of the court that the present value of her life be ascertained by dividing the sum total of such prospective earnings for 40 years by $1 plus the interest thereon at 7 per cent. (not compounded), they may have further decided to compute such interest for the *average* time of 20 years only, instead of for the entire period of 40 years, for the reason that such earnings might be considered as an annuity, and they might thus have easily found more than $10,000, and this method, though evidently not mathematically accurate, may nevertheless have produced a correct result, under some views they may have entertained of the evidence, and allowing for proper adjustments and reductions and all necessary modifications. It is unnecessary, however, for us to surmise *how* the jury reached its verdict, if the verdict found was, under any view, reasonably authorized by the evidence.

It is true the trial judge instructed the jury how to arrive at the present cash value of the life of the deceased, and (as we have said above) the use of this method may have produced an amount less than the amount of the verdict; but the jury were not confined to the particular method of calculation suggested by the court, or in fact to any particular method of calculation, and were authorized to adopt any method which might produce a correct and legal result, and a result in excess of that which could be reached through the method suggested by the court. So, entirely regardless of whether the instruction given by the court was absolutely correct or not, or was in fact followed by the jury, and without even conjecturing how the jury reached their verdict, if that verdict can be upheld under any view of the evidence and under recognized legal rules, in the absence of error in the conduct of the trial which was harmful to the defendant, it should not be set aside because, under some view or by some particular method of calculation, we can not arrive at the same result. As held in *Spence* v. *State*, 7 *Ga. App.* 825 (68 S. E. 443), "The validity of a verdict is to be

tested by the law as it is written, and not by the law as it is given in charge." In *Birmingham Fertilizer Co.* v. *Dozier,* 13 *Ga. App.* 760 (79 S. E. 927), it was said: "If the result reached by the jury would have been the correct conclusion of the case had the judge ruled or charged in accordance with the contentions of one of the parties to the case, the verdict will not be set aside merely because the judge erroneously . . omitted to give in charge to the jury a principle which should appropriately have been included within his instructions. In other words, if the result reached would have been the same had the court ruled properly, and if the jury found rightly in spite of judicial error, the finding will not be set aside in order that the same result may be reached by a proceeding free from legal error." See also *Young* v. *State,* 10 *Ga. App.* 116 (72 S. E. 935) ; *Register* v. *State,* 10 *Ga. App.* 633 (74 S. E. 429) ; *Jones* v. *State,* 12 *Ga. App.* 135 (76 S. E. 1070) ; *Southern Railway Co.* v. *Ansley,* 8 *Ga. App.* 325, 330 (68 S. E. 1086).

Again, if we estimate that the jury found $766 per annum to be the earning capacity of the deceased at the time of her death, then, tested by the rule laid down in the annuity table in 70 *Ga.,* the present cash value of her life at the age of 24 would have been, as already shown, (766 x 12.037) $9,220.34, and this amount the jury might have lawfully increased by the inclusion as damages in their lump sum verdict of 7 per cent. interest thereon from the date of the death of Mrs. Reagan, July 18, 1912, to the date of the rendition of the verdict on September 17, 1913—1 year, 1 month, and 29 days. This interest would amount to $751.20, which, added to $9,220.34 principal, would give a sum total of $9,971.54, or *practically* $10,000—even allowing for an expectancy of less than 40 years, or of only 38.59 years, as shown by the Carlisle table; and to this might easily and properly be added an additional amount, under the rule in the case of *Metropolitan R. Co.* v. *Johnson,* 91 *Ga.* 466 (18 S. E. 816), or because of the average increased value of her annual services, as hereinafter discussed. In *Central. Railroad* v. *Sears,* 66 *Ga.* 499, it was held that "The question of increasing damages in such a case [a homicide case] was for the jury." See also *Western & Atlantic Railroad Co.* v. *McCauley,* 68 *Ga.* 818; *Western & Atlantic Railroad Co.* v. *Brown,* 102 *Ga.* 13 (29 S. E. 130) ; *Central of Georgia Railway Co.* v. *Hall,* 124 *Ga.* 322, 338 (52 S. E. 679, 4 L. R. A. (N. S. 898, 110 Am. St. R.

170, 4 Ann. Cas. 128). Of course, "where the damages found are discretionary or punitive, this rule does not apply." *Central of Georgia Railway Co.* v. *Hall,* supra. See also *Western & Atlantic R. Co.* v. *Young,* 81 *Ga.* 397 (7 S. E. 912, 12 Am. St. R. 320) ; *Ratteree* v. *Chapman,* 79 *Ga.* 574 (4 S. E. 684).

Still again, we may conclude that even if the jury found that the annual earning capacity of the deceased was less than $766 at the time of her death, they may have considered that her services would grow more and more valuable for many years to come, as she became more intelligent and experienced with the lapse of time (and possibly in ministering to a larger family), and that the *average* value of the services she would be able to render her husband and child during her entire expectancy of about 40 years (after making all proper allowances for diminutions in earning capacity to be anticipated in her later years) would possibly exceed $766 per annum, and might amount to as much as $800 or $900 per annum, or some greater sum, and that the jury could therefore have legitimately found a larger verdict (including interest) than one based on an earning capacity of only $766 per annum.

Lastly, under the rule laid down in *Metropolitan R. Co.* v. *Johnson,* 91 *Ga.* 466 (18 S. E. 817), the jury, in estimating the value of the ordinary domestic services rendered by a wife, were authorized to take into consideration what the value of many services hardly capable of exact proof might be, measured in the light of their own observation and experience, notwithstanding such elements of loss as manual labor would be subject to estimation by witnesses. "When the loss of a wife's services, resulting from a personal injury to her, is to be compensated for, she is not to be treated as an ordinary servant or as a mere hireling. Cooley on Torts, *226; Pennsylvania R. Co. v. Goodman, 62 Penn. St. 329. She sustains to her husband and his household a relation special and peculiar. Her place can not be supplied; no other is capable of filling it. Some wives perform manual labor—others do not; yet the husbands of the latter no less than those of the former would certainly be entitled to compensation from wrong-doers for causing inability to perform service. The actual facts and circumstances of each case should guide the jury in estimating for themselves, in the light of their own observation and experience and to the satisfaction of their own consciences, the amount which would

fairly and justly compensate the plaintiff for his loss. Certainly some elements of loss, such as manual labor, would be subject to estimation by witnesses; and, if evidence of this kind were produced, of course the jury should consider it together with the other facts. But what we hold distinctly is, that there need be no direct or express evidence of the value of the wife's services, either by the day, week, month, or any other period of time, or of any aggregate sum. The court committed no error in denying a new trial." This ruling as to domestic services is cited with approval in *Georgia Railroad Co.* v. *Tice,* 124 Ga. 459, 469 (52 S. E. 916, 4 Ann. Cas. 200). An application of the above principle might alone be sufficient to account for a considerable discrepancy, if under any view such a discrepancy in fact appeared to exist between the cash value of the life of the deceased, as estimated by any method from the direct testimony touching the services she rendered and the value thereof, and the amount of the verdict actually returned by the jury.

From a careful review of the entire record, it appears that there were no errors committed by the trial court which were calculated to prejudice the rights of the defendants; and since there was evidence upon which the jury could legitimately base the verdict returned, the judgment overruling the motion for a new trial is

Affirmed. <em>Broyles, J., not presiding.</em>