22104. SOUTHERN RAILWAY COMPANY *et al. v.* TUDOR.

564

DECIDED FEBRUARY 10, 1933. REHEARING DENIED MARCH 1, 1933.

*O. R. Hardin, Maddox & Sapp, Maddox, Matthews & Owens,* for plaintiff in error.

*M. C. Tarver, Mitchell & Mitchell,* contra.

MacINTYRE, J. Mrs. Mary Lou Tudor brought an action against the Southern Railway Company and its engineer, George Martin, to recover $50,000 for the homicide of her husband, Walter Tudor. The trial resulted in a verdict and judgment against the defendants for $12,500, and the exception is to the judgment overruling the motion for a new trial containing the general and twenty-six special grounds.

Omitting its formal allegations and those allegations which are deemed unnecessary for a determination of the controlling questions presented by the record, the petition substantially avers that at about six o'clock on the morning of November 18, 1930, plaintiff's husband, Walter Tudor, was slowly driving a Ford coupé automobile in a northerly direction along the Waring public road; that Tudor turned off said road into a private road which approached a private crossing of said railway company; that the railroad "runs north and south at this place, and petitioner's husband was driving east over said crossing;" that said private road intersects the railroad at an angle of about forty-five degrees; that said crossing was about twelve or fifteen feet above the level of said Waring public road and only about six or eight feet wide, and the rails of the railroad stood about six or eight inches above the roadbed of the railroad; that the front wheels of said automobile mounted the west rail, but would not mount the east rail, and the automobile stalled upon the crossing; that the headlight of the engine was not burning, the weather was foggy, no sort of signals of any kind were given, Tudor's view was obstructed by bushes, trees, and poles, and the train approached the crossing rapidly and noiselessly down grade at a speed of from forty to fifty miles an hour while the engine was "not working steam;" that Tudor entered upon said crossing without seeing or hearing the approaching train and was killed by the train; that said crossing had been in uninterrupted and continuous use by the public for more than twenty years, and said railway company repaired and undertook to keep it in condition, and these facts were known to all of the railway company's employees, includ-

ing George Martin who was driving the engine which was drawing said train; that "the condition of said crossing and the surroundings were well known by the defendants herein;" that petitioner was the widow of said Tudor, and Tudor left no children; that at the time of his fatal injury Tudor was thirty years of age and in good health, with an expectancy of 34.75 years; and that "he was capable of earning and did earn the sum of $5 per day as a carpenter."

Briefly stated, the acts of negligence alleged are: (a) The rapid, dangerous and negligent rate of speed of the train. (b) The failure of the engineer to blow the whistle or ring the bell "as required by ordinary care and diligence." (c) The failure of the engineer to keep a vigilant lookout "as required by ordinary care and diligence." (d) The failure of the engineer to have the train under control "as required by ordinary care and diligence." (e) The failure of the engineer to make any effort to stop said train. (f) The running of said train in a dense fog at said speed when the headlight was not burning.

Lee Jordan, sworn for the plaintiff, testified in substance as follows: "I was driving along [the Waring road] and Mr. Tudor passed me, and I continued right after him. He was driving about twelve or fifteen miles an hour in a Ford coupé, Model T. It was . . an unusual fog. Mr. Tudor turned off of the Waring road . . at that private crossing. I was coming up the road behind him. I did not hear any train approaching. I was in an open car . . . I did not hear any whistle blow or any bell ring. . . It was a heavy fog. I could see the bulk of something, and I seen it was a car on the engine, on the cow-hooker. When I first saw it . . it was coming . . on the Dalton side of the stock-gap. The train was running, I judge, about thirty-five miles an hour. I think he had put the brakes on at that time. The stock-gap is south of the crossing where Tudor was struck . . something like seventy-five or eighty feet. . . That train ran before it was stopped about twenty-four rails. . . In my opinion . . they are about fifty feet long. . . When I went up to the crossing no other cars had come to the crossing from the time he was struck. . . There where Tudor was killed I noticed there had been a car against the rails. . . There were some signs where it had been skidding. . . These rails extended above the ballast there in the

centre of the crossing about three inches, especially . . close to where an automobile would have to run. That crossing was just wide enough for one automobile to go across. Approaching that crossing from the Waring road it was up grade, . . about fifty per cent. grade. It is about sixty feet from the Waring road . . up to the railroad at the crossing. . . It [the crossing] has existed there for that long [three or four years]. I have made tests in reference to driving a car up that crossing to see what you can see north of the crossing. It was a clear day when I made the test. I went up that grade onto the crossing in a closed car. You have to be pretty close to the crossing before you can see an approaching train very easily. I was in about thirty feet, I reckon, and there was an approaching train coming; but in a closed car it is a little harder to see a train very far up the track. The train would have to be pretty close to you before you could see it, and you would have to be pretty close to the track. When Mr. Tudor's car was struck I was about seventy-five yards from the crossing. It was just a few minutes after Mr. Tudor had gone by me until I saw his car . . on the cowcatcher of the train. . . One might have seen a man on that morning to recognize him . . a couple of hundred feet. . . A fog will collect on a glass door of a car. There was a glass door in this car, and fog did collect on windshields that morning. Tudor in going up to that crossing was going from the west to the east. . . You could see the wheel had been setting against the rail, and it looked like a hole was dug out there and carried [the automobile] south. I didn't notice any headlight burning on that train on this morning."

On cross-examination Jordan testified in part as follows: "As you come north there, there is a bluff just out towards the Waring road, . . so as I approached it [said private road] I was behind that hill. I was not looking out for any train or listening for any signals. I was expecting to cross the track at the first public crossing above that, . . something over four hundred yards north of this private crossing. . . This Miller crossing [the one in question] is . . a private road to the Miller house. It then comes into the public road on the east side of the track. . . Anybody that wants to go to the Miller house uses it. . . It is not generally used by the public . . Right down next to the Waring road there is a fringe of bushes, and after you passed that fringe . .

and got up on the right of way you can see a train coming from the north. When I got up in about fifty feet of the track I could see an approaching train. I could see a little ways up there, about seventy-five or a hundred feet. When I got up in thirty feet of the track I could see straight up the track for half a mile. . I don't know just how far a man could see thirty feet back. . . At that speed [fifteen miles an hour] on that grade a Ford car, assuming that it was in good working condition, could be stopped within fifteen feet. . . When I first saw the train I imagine it was fifty or sixty feet south of the private crossing. . . The car Tudor was driving I judged to be about a 25 or 26 model—an old car. I was driving a Ford that morning, twenty-seven. . . It made considerable noise. That road was rough and that car . . would make quite a lot of noise, and . . the signals may have been given . . for the crossing without my knowing it."

On redirect examination Jordan swore: "On that morning, taking into consideration the condition of the weather, with fog on the glass, in my judgment, you couldn't see a train coming very far at that particular time . . not over seventy-five or eighty feet."

Miss Patsy Miller, sworn for the plaintiff, testified in part that said private crossing had been there twelve or thirteen years, and that during that time the railroad had from time to time done work on it; that when she started to drive an automobile over said crossing in the afternoon before Tudor was killed, the front wheel of her car "hit the rail on the other side and turned the wheels down the track," and caused the car to run down the track the length of the car; that she approached the railroad from the east to the west, and "the rails standing up there without any dirt between them" caused her automobile to act as it did; and that said "crossing was frequently used by people going through that way—used at all times of day and night for twelve years."

On cross-examination Miss Miller testified, that said private road led from the Waring road to her house and on across to another public road; and that it was primarily used as a road to her house, but that she had seen other people using it, but could not say how often.

Henry Petty, sworn for the plaintiff, testified: that the public crossing north of said private crossing ran through his place, and that he was in his front yard, about two hundred yards from the

railroad, when the train passed, and that no whistle was blown or bell rung; that there was a growth at said private crossing that would prevent one from seeing up the railroad until he got close to the track; and that on the foggy morning in question a man driving an automobile could see only a short distance ahead of him.

T. W. Kimbrough, sworn for the plaintiff, testified in part: "I live just across from the crossing on the Waring road in this county where Walter Tudor was killed . . just a little way above on a road that runs out to the public road. I was living there at that time. I have lived there for the last fifteen years. That crossing was there when I moved to that place, and it has been there ever since. I was there when the county authorities rebuilt the Waring road. They did some work on that road leading up to the crossing —they built it. . . They had to regrade it up to the crossing, or to the edge of the right of way, and when that was done the railroad did some work. They have done all of the work that has been done on the crossing since I have been there. I have done a little work on it myself. They did work on it from time to time. Since I have been there I made the road leading up the other way to the other road going across from the crossing to the Grove Level road. . . I go that way to haul wood down, and come in that way. . . That is not used as a public road by people that are acquainted with that road. They go up the Waring road and across that other crossing just above my house. Of course, lots of people drive through that way. . . On the morning that this occurred I was right there at my barn about a hundred and fifty or two hundred yards from the crossing. . . I did not hear that train that struck Mr. Tudor . . blow the whistle on approaching that crossing. . . I did not hear the train blow in approaching the public crossing north of my house. If any bell was ringing on that train, I didn't notice it. It may have been." This witness further testified in substance that the morning was very foggy, the train was "just rolling down" at about thirty-five or forty miles an hour, and that he heard three quick blows of the whistle and the noise made by the brakes being put on when the train was just about at said crossing.

T. W. Johnson testified that in his judgment "you could see a train approaching from the north" when you got within ten or twelve feet of said crossing, and that no whistle was blown.

Caylor Johnson testified: that after breakfast on the morning of the homicide he saw some tracks "where the rear wheels had skidded and plowed out in the ground on the west side of the rails;" that the rails "were sticking up above the filling;" that this skidding might have happened on the night before the accident; that the accident happened after sunup, but that it was foggy and any one might have had a light in his house; and that the car that made "those skid marks . . was . . going from the west side to the east side."

Sam Farmer testified: that he lived about three hundred yards south of said crossing; that he was at home, "with no machinery running around him," and heard the train coming, but that he did not hear it give any signal; that said train was about two hundred yards below said crossing when he first saw it; and that witness saw "evidence of some car having skidded and the wheel spinning on the west side," and that the car that made those marks was going east.

Charley Rollins' testimony adds nothing of importance to the evidence already outlined.

Mrs. Mary Lou Tudor testified in part as follows: "He [Walter Tudor] was thirty years old, an able-bodied man in good health. He followed carpentering, and moulding and upholstering in the chair factory. When he worked at the carpenter trade he averaged making $3.50 and $4 a day, at upholstering $4.50 and $5 a day, and as a moulder $5.50 and $6 a day." On cross-examination Mrs. Tudor testified in part: "My husband worked as a moulder at Cleveland, Tenn., about three years ago. . . I know what he was making. He would bring his money in, and I saw it. . . He got it at the stove-foundry: that's where his checks came from. . . I saw him draw from $25 to $28 a week. The reason he quit and came to Dalton was work got dull and they laid hands off. After he came to Dalton he went to work . . for Mr. Jones in his garage. He made anywhere from $16 to $18 a week down there. . . Here in Walton, besides that, he did any kind of work he could pick up to do—carpenter work. When he worked for Mr. Jones . . it must have been about 1927. . . That was when he first came to Dalton. I couldn't say for sure how long he worked for him—I guess something like four or five months. He began to work at carpenter work. . . He worked for Mr. Barrett

off and on for the last three years. . . I don't know how much to say. The longest that he ever worked for him at one time was, I reckon, five or six weeks any way. . . Besides Mr. Barrett, he worked for Mr. Oxford—I couldn't say for sure how long. . . Working for Mr. Barrett and Mr. Oxford he earned anywhere from $3.50 to $4 a day. . . He also worked for Mr. Carl Puryear . . more than once. I couldn't tell you how long the longest stretch . . was. He worked for Mr. Coker also, doing carpenter work. I don't know how long. . I reckon that's all the kind of work he ever did since he has been in Dalton. At the time he was killed he was picking cotton. . . He got something like 75 cents a hundred pounds for picking cotton. He had been working for Mr. Oxford and all of those carpenter men during the balance of the year, off and on. He had been to the chain-gang. . . I won't say for sure whether it was just prior to the time he was killed that same year or not. . . He did not have a regular job. He just worked a day here and there when he could get something to do. There wasn't very many weeks that passed that he didn't have something to do. . . My husband worked all the time that he could get anything to do. Moulding was his trade."

Plaintiff introduced in evidence Rule No. 108 of the Southern Railway Company, which reads as follows: "Freight-trains must use less than the minimum time between stations, as shown in the time tables; but must not exceed the speed of thirty miles an hour."

George Martin, sworn for the defendants, testified: that he was driving the engine that struck Tudor; that his trains passed over two crossings north of the crossing where Tudor was killed; that one of these crossings was about four hundred yards north of said private crossing, and the next one about the same distance north of the one first mentioned; that the bell of his engine was ringing when he approached the first crossing, but that after passing the second crossing he cut off the bell; that it was after sunup, but the fog had not dissipated; that he could see a little better after the headlight was turned off; that when he first saw the Tudor car it had left the Waring road and was about half way to the railroad; that his train was behind time and was running thirty miles an hour when it approached said private crossing; that Tudor was running about seven or eight miles an hour when witness saw him from a distance of about two hundred and fifty feet; that Tudor never did slow down

and his car "never did stop on the tracks at all;" that when the front wheels of the car got about the middle of the track the engine struck it and the car skidded down the track; that after witness came in sight of said private crossing he could not possibly have stopped his engine before reaching the car; that the train was heavy and the grade down; and that witness had been making that run for three months and knew the nature of the crossing, but that he had never seen anybody using it.

On cross-examination Martin testified: that he made his first trip over said crossing in 1905 when he was a fireman; that he was under the impression that he sounded the whistle and rang the bell at the two public crossings north of said private crossing, but that this was "a matter of impression;" that on the morning in question he "did not give any sort of warning to any person who might be approaching the crossing, or approaching the track," and only blew the whistle and rang the bell at the crossings north of that; that his "conception of the rules of the railroad company" was that "never under any circumstances would it be necessary to ring the bell or blow the whistle, or give any sort of warning, in approaching private crossings;" that witness stopped his train "in eight hundred to one thousand feet;" that in approaching said private crossing on said foggy morning, he did not run his train any slower than usual, did not give any warning that would have been otherwise given, and did nothing except look ahead as usual.

M. M. Blevins, the conductor of the train in question, testified: that at the time of the accident he was standing on the left side of the engine just behind the fireman; that there were also on said engine five others—the engineer, two brakemen, the yard-foreman, and the fireman; that the train was composed of sixty-five cars and was going down grade; that he did not see Tudor's car until after the train stopped; that the first time witness knew of any trouble was when the engineer blew the alarm signal and applied the emergency brakes about three hundred and fifty or four hundred feet north of the crossing; that he supposed the engineer could have reversed the engine, but that it was impossible to stop before reaching said private crossing; and that the train was "just drifting down hill" at possibly thirty miles an hour.

John Oxford, sworn for the defendants, testified: that Tudor had only worked for him about two weeks in the past two years; that

sometimes he would work nine hours a day, and sometimes ten hours, and that witness paid Tudor 25 cents an hour.

Sam Bingham, sworn for the defendants, testified that Tudor worked for Barrett Construction Company about two months in all as a common laborer for 25 cents an hour.

H. L. Wilson, sworn for the defendants, testified in regard to certain photographs that were introduced in evidence to show the lay of the land. He also swore: "There is no foliage on the right of way. The bushes are about fifteen feet from the road. The road is about a hundred feet from the crossing."

The defendants next introduced the record of a case in which Walter Tudor pleaded guilty to simple larceny at the April term, 1930, of Whitfield superior court, and was sentenced to work on the chain-gang for two months or pay a fine.

■ We have by no means set out all the evidence in the record. We feel, however, that we have set out enough of it to sustain our view that the evidence supports the verdict. Whether the deceased could have avoided the consequences to himself of the defendants' negligence by the exercise of ordinary care, or whether he was himself the author of his own death, were jury questions. It may not be amiss to state in this connection that the defendants' answer to the petition brought against them was a denial of the material allegations of the petition.

■ Special ground 1 avers that the trial judge erred in allowing the witness Jordan to testify as to the condition of said private crossing, especially that the rails extended about three inches above the ballast in the centre of the crossing. The objection was that the evidence was irrelevant and immaterial because it did not appear that "this was a public crossing, or one that had been established by law, and no obligation devolved upon the railroad company to keep up the crossing." The petition contains the following averment: "The condition of the crossing is not charged as negligence against the defendants, but is alleged to show that the deceased at the time of the accident was in the exercise of ordinary care." In a note in his approval of the motion for a new trial the trial judge states that the evidence referred to in grounds 1, 2, 4, and 5 was admitted only to bear upon the "question of ordinary care on the part of the deceased." Furthermore, in *Central Railroad & Banking Co.* v. *Robertson,* 95 *Ga.* 430 (22 S. E. 551), it was ruled:

574

"Where a railroad company builds and undertakes to keep in repair for the accommodation of the public a bridge over or approach to a private road crossing, this is such an invitation of the public to the same as would render the company liable for injuries resulting from defects negligently permitted to exist or remain in the bridge or approach, even though it be not affirmatively shown that such crossing is one which the company is bound by statute to keep in safe order and condition." See also *Central of Ga. Ry. Co.* v. *Parker*, 8 *Ga. App.* 826 (70 S. E. 192) ; *W. & A. R. Co.* v. *Gray*, 172 *Ga.* 286 (157 S. E. 482). We hold that this ground discloses no reversible error.

Special ground 2 avers that the court erred in allowing Miss Patsy Miller to give testimony tending to show that the crossing was in bad condition. There is no merit in this ground, for reasons indicated in our discussion of the preceding ground.

It is averred in special ground 3 that the court erred in permitting the witness Kimbrough to testify that the railroad authorities had been keeping the crossing up. The objection was the same set out in that part of this opinion relating to the first special ground. We hold that special ground 3 is not meritorious.

Special ground 4 avers that the court erred in allowing Caylor Johnson to give testimony indicating that the crossing was in bad condition. There is no merit in the ground.

■ Special ground 5 avers that the testimony of Caylor Johnson that he noticed where an automobile had skidded on said crossing was a conclusion of the witness because it assumed that the skidding was done by Tudor's car. Johnson examined said crossing shortly after the homicide. We see no merit in the ground.

■ It is averred in special ground 6 that the court erred in permitting the witness Henry Petty to swear that the train in question approached the public crossing four hundred yards north of said private crossing without ringing the bell or blowing the whistle. We confess that the evidence was of doubtful admissibility, but considering the nearness of the public crossing to the crossing where the homicide occurred, and the other facts of the case, we hold that this ground does not require a new trial. In this connection, see *S. F. & W. R. Co.* v. *Flannagan*, 82 *Ga.* 579 (9 S. E. 471, 14 Am. St. R. 183) ; *Purser* v. *McNair*, 153 *Ga.* 405 (2) (112 S. E. 648).

■ Ground 7 avers that the court erred in allowing the plaintiff

to testify that on the morning of the homicide her husband told her that Mrs. Miller had some land to rent. The court allowed the testimony to go in to "explain conduct and ascertain motives." The testimony appears to have been introduced to indicate that Mr. Tudor was on a mission of business when he started over said private crossing. We think that the evidence was admissible for the reason pointed out by the court. See Civil Code (1910), § 5763. To throw further light upon the question raised in this ground, it may not be amiss to quote the following from the testimony of the witness T. W. Kimbrough: "I had a crop there. . . A short time before that I was not particularly looking for a tenant. A man that has got land to rent, the tenant looks for him. I did have some to rent a short time before that."

▮ Special ground 8 complains of the admission in evidence of Rule 108 of the defendant railway company, which rule reads as follows: "Freight-trains must use not less than minimum time between stations, as shown in the time tables; but must not exceed the speed of thirty miles an hour." The objection was that said rule concerned only the railroad and its employees, and "had no effect and no bearing on their relation to the general public." We are inclined to the opinion that the rule was admissible in evidence for the purpose of indicating that the railroad company recognized that the running of freight-trains at a greater speed than thirty miles an hour might amount to negligence. Indeed, the facts of this very case show that a long, heavy freight-train is difficult to handle, even when the engine is equipped with improved devices for controlling its speed. For instance the conductor testified that the engineer applied the emergency brakes about 350 or 400 feet north of the crossing and the train did not come to a full stop until it had run approximately nine hundred feet south of said crossing. The principle announced in headnote 8 of *Atlanta Consolidated Street Ry. Co.* v. *Bates,* 103 *Ga.* 333 (30 S. E. 41), appears to be applicable to the question under consideration. That headnote reads as follows: "A rule of the defendant company requiring its motormen to keep their cars under full control on approaching all street-crossings, and when there is a car standing on a crossing taking on or letting off passengers, or if they see that they are about to meet a car on a street-crossing, to slow up and see that the track is clear before attempting to pass, was admissible in evidence as tend-

ing to show that the company regarded such point on its line, when being approached by one of its cars, as more or less dangerous to passengers and others." See also *Ga. R.* v. *Williams,* 74 *Ga.* 723 (3). We hold that the rule was admissible.

■ The gist of special ground 9 is that the court permitted the engineer to testify, on cross-examination, that he gave no warning of any sort as his engine approached said private crossing because he knew of no requirement that he do so. Evidently plaintiff's case rested largely upon the idea that the defendants were lacking in ordinary care in regard to the manner in which the engine approached said crossing. As bearing upon the question at issue, we quote as follows from *So. Ry. Co.* v. *Slaton,* 41 *Ga. App.* 759 (2) (154 S. E. 718) : "Where a private way crosses the track of a railroad company, and the crossing is maintained by the company, and has for a number of years been in constant and uninterrupted use by the people of the community, a jury may be authorized to find that the servants in charge of a train should anticipate that a person may be on the track at such point, and use such precaution to prevent injury to him as would meet the requirements of ordinary care." We hold that the evidence was properly admitted.

■ In special ground 10 it is averred that the court erred in allowing the witness George Martin to answer the following question : "If you put on the brakes at two hundred or two hundred and fifty feet north of the crossing, and if you could stop the train in eight hundred or a thousand feet, it ought not to have gone more than eight hundred feet at the outside, south of the crossing?" The answer was : "Something like that." The objection was that "it would be a pure conclusion." The question was propounded to an engineer of long experience, and was based upon facts adduced at the trial. We see no error here. In this connection see *Ga. Ry. & Power Co.* v. *Simms,* 33 *Ga. App.* 535 (8) (126 S. E. 850).

■ The gist of ground 11 is that the court fully stated plaintiff's contentions, but failed to give the jury the substantial contentions of the defendants. The court did state the contentions of the defendants at some length. Furthermore, he made the following statement to the jury : "I have not given you all of the contentions of the parties in the case. You will have the pleadings out with you. You may refer to these pleadings as often as you see fit, to ascertain exactly what the contentions are." We hold that the ground is not

meritorious. Neither is there any merit in the assignment of error that the charge impressed the jury with the idea that Martin admitted the acts of negligence charged against him.

■ The material part of the excerpt from the charge complained of in ground 12 is in the exact language of headnote 2 of *So. Ry. Co.* v. *Slaton,* hereinbefore quoted in our discussion of ground 9. The criticisms of the charge are numerous, covering three and a half pages of closely typewritten matter. Time forbids that we discuss each assignment in detail. We see no merit in any of them.

■ Special ground 13 complains of this charge of the court: "If you find from the evidence that the defendant's employee, or employees, as the case may be, was negligent in any of the particulars alleged in the petition, and that that negligence was existing at the time the deceased was killed, the plaintiff still could not recover if, by the exercise of ordinary care, the deceased in driving his automobile at the time, could have discovered the defendants' negligence and could have, by the exercise of ordinary care, avoided the same." The charge confined the jury to the allegations of negligence contained in the petition, and was not subject to the criticism that the use of the words "employee" and "employees" injected into the case "issues not made by the plaintiff's petition." Neither is the charge erroneous for the reason that it limited the jury, "in passing upon the question of the care of the deceased, solely to a determination of whether or not he actually discovered the defendants' alleged negligence, or, in the exercise of ordinary care, should have anticipated and discovered same." We see no merit in this ground.

■ In ground 14 complaint is made of the following charge: "I charge you that if the plaintiff is entitled to recover in this case, such recovery would have to be jointly against both defendants. . . Your verdict would be, if you find for the plaintiff: 'We, the jury, find for the plaintiff against the defendants' so many dollars; or, 'We, the jury, find for the defendants'." Under the pleading and the evidence in this case, the charge was not erroneous.

■ In ground 15 the court instructed the jury that there is "no law in this State requiring the engineer . . to signal the approach of the train to a private crossing," but that "where such engineer knows, or has reason to believe, that persons may be at such crossing," a "duty devolves upon the engineer . . to exercise

■

. . ordinary care to anticipate the presence of such persons and to avoid injuring them." We do not think that the charge expressed any opinion of the evidence, or that it was inappropriate because "there is no law . . imposing any such duty upon the engineer on approaching a private crossing." Under the allegations of the petition and the evidence in the case, the charge was appropriate, and the ground discloses no reversible error.

■ In ground 16 complaint is made of this charge: "I charge you that Mr. Tudor, in approaching or going upon the railroad crossing, was under a duty to exercise ordinary care to avoid the consequences incident thereto, or resulting from going on the crossing, by remaining away, going away, or getting out of the way of a probable or known danger; and if he failed to exercise such ordinary care, there can be no recovery in this case. On the other hand, if he did exercise ordinary care, there might be a recovery." The criticisms of this charge are: (a) "that the jury were . . authorized to base a recovery in plaintiff's favor solely on a finding that the deceased was in the exercise of ordinary care, and (b) "to find in favor of plaintiff, even though they might find there was no negligence on the part of the defendants, or either of them."

Bearing in mind that the judge could not be expected to state all the law of the case in one short excerpt dealing with a particular feature of the law, and that he fully charged the law as to the burden of proof, we are constrained to hold that this ground discloses no reversible error.

■ It appears from ground 17 that after the jury had retired to consider their verdict they were recalled by the court, and that, after a colloquy between one of the jurors and the court, his honor instructed the jury in certain particulars. There is nothing in the recharge, or in said colloquy, that requires a reversal of the judgment.

■ In so far as the requests to charge set out in special grounds 18, 19, 20, and 21 are correct and applicable to the case, they were sufficiently covered by the charge given.

■ Complaint is made in ground 22 that the court erred in failing to charge the jury, as requested in writing, "that upon approaching any railroad crossing, the operator of such automobile shall at all times have such automobile under immediate control, and shall not operate said vehicle at a greater rate of speed than

ten miles per hour." The requested charge contains the definition of "immediate control" in the language of the decision in *Central of Ga. Ry. Co. v. Burton, 33 Ga. App.* 199, 201 (125 S. E. 868). In this connection it may not be amiss to state that the engineer of the train testified that in approaching the crossing Tudor's automobile was traveling "just about as fast as a man ordinarily walks, not faster." The witness Jordan testified that a Ford car in good condition approaching the crossing could be stopped "almost instantly." Furthermore, it appears to be the opinion of this court that the act of 1921, from which the requested charge was taken, has been superseded by subsequent legislation. See *Seaboard Air-Line Ry. Co. v. Benton, 43 Ga. App.* 495 (159 S. E. 717). We hold that the ground discloses no reversible error.

 It is averred in ground 23 that the court erred in refusing to give the following requested charge: "I charge you that there is a principle of law that a person while grossly negligent himself has no legal right to count on due diligence by others, but is bound to anticipate that others, like he has done, may fail in diligence, and must guard, not only against negligence on their part which he might discover in order to avoid the consequences, but also against the ordinary danger of there being negligence which he might not discover until too late. If, therefore, you find that Mr. Tudor was grossly negligent in approaching and attempting to traverse the crossing in question, then I charge you that Mr. Tudor would not have a legal right to count on due diligence by the railway company or its engineer, but was bound to anticipate that they might fail in diligence, and to guard against any negligence on their part, which he might have actually discovered, but against any such negligence which he might not have discovered until it was too late."

The requested charge is a paraphrase of the language of Chief Justice Bleckley in the case of *Central Railroad and Banking Co. v. Smith, 78 Ga.* 694 (3 S. E. 397), where a man was walking down the centre of the railroad-track before day, in the morning. The court did charge the jury as follows: "I charge you . . that a person, while grossly negligent himself, has no legal right to count on due diligence by others, but is bound to anticipate that others, like he has done, may fail in diligence, and must guard not only against negligence on their part which he might discover in

time to avoid the consequences, but also against the ordinary danger of there being negligence which he might not discover until too late." The charge given covers the principle of law invoked by the requested charge, and was, in our opinion, a more appropriate and proper charge than the one requested. We hold that the court did not err in refusing to charge as requested.·

■ Special ground 24 avers that the court erred in failing to charge the following portion of section 2781 of the Civil Code (1910) : "No person shall recover damages from a railroad company for injury to himself or his property, where the same is done by his consent, or is caused by his own negligence." It appears from the court's note, as well as from an inspection of the charge itself, that the following instruction was given: "If Walter Tudor failed to exercise ordinary care for his own safety upon the occasion in. question, then I charge you that the plaintiff's wife could not recover." We think that the charge referred to should have been given in the language of the code section, but it occurs to us that the very broad charge given was very favorable to the defendants; and we hold that, in the absence of any request to charge, the court did not err for the reason assigned.

■ Special ground 25 avers that the verdict of $12,500 "is so grossly excessive as to show and indicate undue bias and prejudice against these defendants." The amount of the verdict must have been determined largely from the testimony of the plaintiff, which appears elsewhere in this decision. We confess that her testimony in regard to her husband's earnings is not as accurate as could be desired, especially as to the length of time that he worked at his various vocations. In *R. & D. R. Co.* v. *Allison*, 86 *Ga.* 145 (12 S. E. 352, 11 L. R. A. 43), the question under consideration was ably discussed. Headnote 1 of the decision is as follows: "No fixed rule exists for estimating the amount of damages from permanent injuries to the person. The amount should be reasonable and just to both parties, and should compensate the injured one for the loss of money which he would probably earn had not the injuries occurred." See also *City of Thomasville* v. *Jones*, 17 *Ga. App.* 625 (3) (87 S. E. 923) ; *Standard Oil Co.* v. *Reagan*, 15 *Ga. App.* 571 (8) (84 S. E. 69). In the last case cited the following phrase is used: "The reasonably probable average earnings of the deceased." Indeed, so many uncertain factors enter into the problem of de-

termining the value of a life that the courts have in strong language approved the following rule laid down in the Civil Code (1910), § 4399 : "The question of damages being one for the jury, the court should not interfere, unless the damages are either so small or so excessive as to justify the inference of gross mistake or undue bias." In the light of the evidence, the approval of the verdict by the trial judge, and the rule applied by the courts of this State in such cases, we do not think that the verdict is so excessive as to show undue bias or prejudice on the part of the jury; and we decline to reverse the judgment for the reason assigned in this ground.

 In special ground 26 it is averred that the trial judge erred in refusing to declare a mistrial because of the following statement made to the jury by counsel for the plaintiff in the court below : "I don't want you to make a verdict in this case on anything else but the evidence. Replying to the argument of my brother, in which he brought to your attention the general condition of this country and the difficulty great corporations were having to pay dividends (he may not have said so in so many words, but that is what he meant, and you so understood it, the importance of railroad companies paying dividends),—but it really is not as important to that poor woman, as it is important for them to pay this poor woman here for the homicide of her husband, to support herself and her children, while Walter Tudor lies rotting in his grave." Upon the motion for a mistrial being made, the court said : "The jury will be governed only by the evidence, and not by any prejudice for the woman, or against her." The motion was then overruled without more ado. The remarks of counsel were highly improper, but in the light of the court's prompt cautionary instructions to the jury, we hold that the refusal to declare a mistrial is not reversible error.

*Judgment affirmed. Guerry, J., concurs. Broyles, C. J., dissents.*

### ON MOTION FOR REHEARING.

MacIntyre, J. Counsel for the movant insist that a careful consideration of the evidence adduced upon the trial conclusively shows that the verdict awarding the plaintiff damages is not supported by the evidence. In this connection, counsel correctly point out that in quoting a portion of Lee Jordan's testimony having reference to the approach of an automobile to the railroad-crossing,

this court quoted the witness as testifying that "at that speed [fifteen miles an hour] on that grade, a Ford car, assuming that it was in good working condition, could be stopped within fifteen feet;" whereas the witness testified that under such circumstances the automobile could be stopped within "five" feet. We readily admit this error, but do not think that is material in so far as ultimate results are concerned. As indicated in the original opinion, we made no attempt to set out all the evidence in the voluminous record. However, we did study the record carefully, and, after considering it again, we see no cause for receding from our holding that the evidence supports the verdict.

After considering the reasons assigned why this court erred in its rulings upon the special grounds of the motion for a new trial, we adhere to the opinion that these grounds disclose no reversible error.

*Rehearing denied. Guerry, J., concurs. Broyles, C. J., dissents.*